Howard Marc Spector
TBA # 00785023
SPECTOR & JOHNSON, PLLC
12770 Coit Road, Suite 1100
Dallas, Texas 75251
(214) 365-5377
FAX: (214) 237-3380
Hspector@spectorjohnson.com

COUNSEL FOR THE DEBTORS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **RMR Operating, LLC, et al.,** | § | **CASE NO. 16-30988-11** |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |

## DISCLOSURE STATEMENT IN CONNECTION
## WITH DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION

TO:   ALL PARTIES-IN-INTEREST, THEIR ATTORNEYS OF RECORD AND TO THE
      HONORABLE UNITED STATES BANKRUPTCY JUDGE:

       RMR Operating, LLC, Red Mountain Resources, Inc., Cross Border Resources, Inc., and Black Rock Capital, Inc. [collectively, the "**Debtors**"], as debtors and debtors-in- possession in the above-captioned Cases submit this Disclosure Statement [the "**Disclosure Statement**"] pursuant to Section 1125 of the Bankruptcy Code[1] for the purpose of disclosing that information which the Bankruptcy Court has determined is material, important, and necessary for parties entitled to vote on the Debtors' Second Amended Joint Plan of Reorganization dated June 22, 2018 [the "**Plan**"] in order to arrive at an intelligent, reasonably informed decision in exercising the right to vote for acceptance or rejection of the Plan. This Disclosure Statement describes transactions contemplated under the Plan. You are urged to study the Plan in full and to consult with your counsel about the Plan and its impact upon your legal rights.

A.   Explanation of Chapter 11 and the Confirmation Process.

       Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Upon the commencement of these chapter 11 Cases, or cases under any other chapter, Section 362 of the Bankruptcy Code provides for an automatic stay of all attempts to collect upon claims against a debtor that arose prior to the bankruptcy filing.  Generally speaking, the automatic stay prohibits interference with a debtor's property or business.

---

[1] Unless otherwise defined herein, capitalized terms have the meaning ascribed to such term in the Plan.

Under chapter 11, a debtor attempts to reorganize for the benefit of the debtor and its creditors. A plan of reorganization sets forth the means for satisfying all claims against a debtor. Generally, a claim against a debtor arises from a normal debtor/creditor transaction, such as a promissory note or a trade credit relationship, but may also arise from other contractual arrangements or from alleged torts.

After a plan of reorganization has been filed with a bankruptcy court, it must be accepted by holders of impaired claims and interests against the debtor. Section 1125 of the Bankruptcy Code requires that a plan debtor fully disclose sufficient information about the debtor, its assets and the plan of reorganization to creditors before acceptances of that plan may be solicited. This Disclosure Statement is being provided to satisfy such requirements of Section 1125 of the Bankruptcy Code.

The Bankruptcy Code provides that creditors and interests are to be grouped into "classes" under a plan and that they are to vote to accept or reject a plan by class. While courts have disagreed on the proper method to be used in classifying creditors, a general rule of thumb is that creditors with similar legal rights are placed together in the same class. For example, all creditors entitled to priority under the Bankruptcy Code might be placed in one class, while all creditors holding subordinated unsecured claims might be placed in a separate class. Generally, each secured creditor will be placed in a class by itself because each such creditor usually has a lien on distinct property and therefore has distinct legal rights. Holders of Equity Interests are also placed in their own class.

The Bankruptcy Code does not require that each claimant vote in favor of the Plan for the Bankruptcy Court to confirm the plan. Rather, the plan must be accepted by each class of claimants [subject to an exception discussed below]. A class of claimants accepts the plan if, of the claimants in the class who actually vote on the plan, such claimants holding at least two-thirds in dollar amount and more than one-half in number of allowed claims vote to accept the plan. For example, if a hypothetical class has ten creditors that vote and the total dollar amount of those ten creditors' claims is $1,000,000, then for such class to have accepted the plan, six or more of those creditors must have voted to accept the plan [a simple majority], and the claims of the creditors voting to accept the plan must total at least $666,667 [a two-thirds majority].

The Court may confirm a plan even though fewer than all classes of claims or interests accept it. In this instance, the Plan must be accepted by the holder of the Equity Interests in the debtor, or debtor is entitled to request that the Bankruptcy Court confirm the plan pursuant to the "cramdown" provisions of Section 1129[b] of the Bankruptcy Code. These "cramdown" provisions permit the plan to be confirmed over the dissenting votes of classes of claims or interests if the Bankruptcy Court determines that the plan does not discriminate unfairly and is fair and equitable with respect to each impaired, dissenting class of interests.

Independent of the acceptance of the plan as described above, to confirm the plan, the Bankruptcy Court must determine that the requirements of Section 1129[a] of the Bankruptcy Code have been satisfied.

The Court has set a hearing on confirmation of the Plan for **September 26, 2018 at 2:00 p.m.** Central Time in the courtroom of the **Honorable Barbara J. Houser, United States Bankruptcy Court, 1100 Commerce Street, 14th Floor, Dallas, Texas 75242**. The confirmation hearing may be adjourned by the Bankruptcy Court from time to time without further notice except for an announcement made in open court at the confirmation hearing or any continued hearing thereon.

Section 1128[b] of the Bankruptcy Code provides that any party in interest may object, in writing, to confirmation of a plan of reorganization or the Disclosure Statement. Written objections to confirmation of the Plan or the Disclosure Statement, if any, must be filed with the Bankruptcy Court *and* a copy of such written objections must be *actually* received by counsel for the Debtors at the following address on or before _____, 2018:

SPECTOR & JOHNSON, PLLC
12770 COIT ROAD
BANNER PLACE, SUITE 1100
DALLAS, TEXAS 75251

B.     Voting Procedures.

   1.     Designation of Impaired and Unimpaired Classes.

      a.     Impaired Classes. Classes 1RD, 1RR, 1CB, 1BR, 4RR, 4CB, 6CB, 6BR, 6RD, 6RR, and 7RD are impaired.

      b.     Unimpaired Class. Classes 2RD, 2RR, 2CB, 2BR, 3RD, 3RR, 3CB, 3BR, 4RD, 5, 7RR,7CB, 7BR, and 8 are unimpaired.

      c.     Classes Entitled to Vote. Classes 1RD, 1RR, 1CB, 1BR, 4RR, 4CB, 6RD, 6CB, and 6BR are entitled to vote.

      d.     Classes Not Entitled to Vote. Classes 2RD, 2RR, 2CB, 2BR, 3RD, 3RR, 3CB, 3BR, 4RD, 5, 7RR, 7CB, 7BR, and 8 are deemed to accept the Plan and are thus not entitled to vote. Class 6RR and Class 7RD are deemed to reject the Plan and are thus not entitled to vote.

   2.     Ballots.

   **IT IS IMPORTANT THAT HOLDERS OF IMPAIRED CLAIMS EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN**. All known holders of Claims entitled to vote on the Plan have been sent a ballot, together with instructions for voting, with this Disclosure Statement. In voting for or against the Plan, use only the ballot sent with this Disclosure Statement.

**THE VOTING DEADLINE IS _____, 2018. ALL BALLOTS MUST BE RETURNED SO THAT THEY ARE *RECEIVED* BY THE BALLOTING AGENT PRIOR TO THE VOTING DEADLINE. THE NAME AND ADDRESS OF THE BALLOTING AGENT IS SET FORTH ON THE BALLOT.**

C.     Approval of Disclosure Statement.

This Disclosure Statement is provided pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of acceptance of the Plan, as it may be amended or modified. The purpose of this Disclosure Statement is to provide such information as will enable a hypothetical, reasonable investor, typical of the holders of Claims, to make an informed judgment in exercising its rights either to accept or reject the Plan. A copy of the Plan is attached hereto as "**Exhibit A.**"

The Bankruptcy Court approved this Disclosure Statement as containing information of the kind and in sufficient detail adequate to enable a hypothetical, reasonable investor typical of the classes being solicited to make an informed judgment about the Plan.

NO REPRESENTATIONS CONCERNING THE PLAN ARE AUTHORIZED OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. THE DEBTORS RECOMMEND THAT ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH IS NOT CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN REACHING YOUR DECISION ON HOW TO VOTE ON THE PLAN. ANY REPRESENTATION OR INDUCEMENT MADE TO YOU NOT CONTAINED HEREIN SHOULD BE REPORTED TO THE ATTORNEY FOR THE DEBTORS WHO SHALL DELIVER SUCH INFORMATION TO THE COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS CORRECT, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND HOLDER OF AN IMPAIRED CLAIM OR EQUITY INTEREST IS URGED TO CAREFULLY REVIEW THE PLAN PRIOR TO VOTING ON IT.

D.     Nature of the Debtors' Business.

The Debtors' business is focused on the acquisition and efficient operation and development of onshore oil and gas properties in the southwestern United States. The Debtors' interest in such properties is obtained via written agreement (each, a "**Lease**") with various third parties who own mineral interests in oil, natural gas, and other minerals in place under a parcel of land. Pursuant to such Leases, the Debtors have the right to enter and capture oil and natural gas through exploration, drilling, and production operations (each such right, a "**Working Interest**"). The Debtors own mineral interests and both full and partial Working Interests in oil and natural

gas fields and Cross Border or RMR serves as operator for all of such Working Interests. Currently, the Debtors own Working Interests in approximately 90 gross wells, most of which are subject to joint operating agreements ("**JOAs**"). The Debtors must satisfy certain obligations to maintain the Debtors' Leases and ensure continued production. These obligations include the Debtors' pro rata share of: (a) proceeds generated from the Working Interests' production attributable to the Mineral Owners under the Leases, which are free from production expenses (the "**Royalty Obligations**"); and (b) expenditures associated with the operators developing and producing oil and natural gas from the Debtor Reserves (the "**JOA Obligations**," and, together with the Royalty Obligations, the "**Oil and Natural Gas Obligations**"). As operator, Cross Border or RMR must perform day-to-day business activities such as extracting oil, natural gas, and natural gas liquids ("**NGLs**") and covering expenses incurred in such operations. The Oil and Natural Gas Obligations, the Royalty Obligations and the JOA Obligations are neither uniform nor predictable on a month-to-month basis. If the foregoing obligations go unsatisfied, the Debtors' business could suffer material adverse consequences, and the Debtors could potentially lose their Working Interests.

E.    History of the Debtors

The Debtors are Dallas-based companies with oil and natural gas properties in the Permian Basin of West Texas and Southeast New Mexico.

On April 21, 2015, certain Debtors entered into a purchase and sale agreement (the "**PSA**") with Black Shale. Pursuant to the PSA, those Debtors sold, assigned, transferred and conveyed to Black Shale, effective as of April 1, 2015, fifty percent (50%) of its right, title, and interest in and to certain oil and natural gas assets and properties, including its oil and natural gas leasehold interests, wells, contracts, and oil and natural gas produced after April 1, 2015. The aggregate purchase price under the PSA was $25.0 million, subject to certain adjustments, including post-closing adjustments for any title or environmental benefits or title or environmental defects resulting from Black Shale's title and environmental reviews.

F.    Assets of the Debtors

The Debtor's remaining oil and natural gas properties are concentrated in the Permian Basin, and Southwest New Mexico. The Permian Basin covers an area approximately 250 miles wide and 300 miles long in West Texas and Southeast New Mexico. The Permian Basin is one of the most prolific onshore oil and natural gas producing regions in the United States. It is characterized by an extensive production history, mature infrastructure, long reserve life and hydrocarbon potential in multiple producing formations.

The following is description of the Debtors' properties

Permian Basin:

Tom Tom Area. The Debtors own oil and natural gas interests in approximately 27,800 gross (11,200 net) acres in the Tom Tom and Tomahawk fields in Chaves and Roosevelt Counties, New Mexico through the Debtors' ownership of Cross Border. Cross Border is the operator of these leases. The target formation in the area is the San Andres reservoir, which is productive across the trend with the Cato field to the west and the Chaveroo field to the east.

Cowden Lease. The Debtors own oil and natural gas interests in 760 gross (740 net) acres plus 48 acres of surface property in the Cowden Lease in Ector County, Texas. The Cowden Lease is held by production. RMR Operating is the operator of the Cowden Lease. The Cowden Lease is located between the Harper and Donnelly San Andres fields on the Central Basin Platform and produces from the Grayburg and San Andres formations.

Shafter Lake Lease. The Debtors own oil and natural gas interests in 322 gross (186 net) acres within the Shafter Lake San Andres field in Andrews County, Texas. The Shafter Lake Lease is horizontally severed at 4,520 feet and is held by production. The Debtors own all rights from the surface of the land to approximately 4,520 feet below the surface of the land. RMR Operating is the operator of the Shafter Lake Lease.

Maralo Prospect. The Debtors own oil and natural gas interests in 320 gross (160 net) acres in the Maralo Prospect in Lea County, New Mexico. This acreage targets the Tansill, Yates and Delaware formations. RMR Operating is the operator of the Maralo Prospect.

New Mexico Non-Permian Minerals

Cross Border owns 536,526 gross (134,085 net) mineral acres in Hidalgo, Grant, Sierra, Socorro, and De Baca Counties, New Mexico. This mineral ownership carries no drilling commitments or leasehold obligations.

G.      Liabilities

Pre-petition scheduled unsecured liabilities for each of the Debtors were as follows:

| Red Mountain | RMR | Cross Border | Black Rock |
|---|---|---|---|
| $601,256 | $1,230,855 | $410,042 | $22,600 |

The Debtors have not attempted to reconcile the filed Proofs of Claim to the amounts above because significant (and often duplicative) claims have been filed against multiple Debtors, often based on claims which are disputed by the Debtors. If those Contested Claims are ultimately Allowed, they could have a significant impact on the percentage recovery of enjoyed by holders of Allowed Claims. Additionally, claims of Interest Burden Payees have been paid in the Black Rock and RMR estates which have reduced the pre-petition liabilities of these Debtors.

The Debtors are generally current with their Post-Petition payables. Post-Petition legal Claims are not expected to exceed $100,000.

H.    Directors, Executive Officers and Corporate Governance

The following sets forth information about those directors and officers who are expected to continue on in a management role with the Reorganized Debtors.

1.    Alan W. Barksdale has been the Red Mountain's President, Chief Executive Officer and Chairman of the Board since June 2011 and served as the Debtors' Interim Acting Chief Financial Officer from June 2011 to August 2011. Mr. Barksdale has also served as President of Black Rock since May 2010. Mr. Barksdale has also been the owner and president of StoneStreet Group, Inc. ("**StoneStreet**") aMr. Barksdale has served as the Non-Executive Chairman of the Board for Cross Border since April 2012.  Mr. Barksdale has served as the President of RMR since June 2011.  nd president and manager of StoneStreet Operating Company, LLC ("**StoneStreet Operating**"), since 2008. Mr. Barksdale has also been the president of AWB Enterprises, Inc., a holding company that owns a percentage of StoneStreet Operating, since November 2011.

2.    Richard F. LaRoche Jr was appointed as a director of Cross Border effective January 3, 2011. Mr. LaRoche served 27 years with National HealthCare Corporation ("**NHC**") as Secretary and General Counsel and 14 years as Senior Vice President, retiring from these positions in May 2002. He has served as a Board member of NHC since 2002. Mr. LaRoche serves as a director of Lodge Manufacturing Company (privately held). He also served on the boards of National Health Investors, Inc. from 1991 through 2008, National Health Realty, Inc. from 1998 through 2007 and Trinsic, Inc. from 2004 through 2006. Mr. LaRoche continues to serve on NHC's Board of Directors and on that Board's Audit Committee, Nominating and Corporate Governance Committee and Compensation Committee.

3.    John W. Hawkins was appointed as a director of Cross Border effective January 3, 2011. Mr. Hawkins has over 30 years experience in management and accounting for NYSE listed companies. He previously served as interim CFO of Pure L.P. and Aztec Energy Partners. In 2002, he retired as VP-Treasurer of Dillard Department Stores after 28 years of service. As VP-Treasurer of Dillard's, he managed the treasury department, assisted with the annual audits, managed payroll department, tax department, accounts payable department, worker's compensation and general liability department, and the employee benefits department. He was one of the 401(k) and pension plan administrators. He was heavily involved in the acquisition of 16 companies totaling approximately $2.5 billion in revenue. Mr. Hawkins received a BBA with a major in accounting from Midwestern University. Mr. Hawkins qualifies as an audit committee financial expert. In addition, his experience with publicly traded companies and his historical knowledge of the Pure operations and assets prior to the Pure merger were significant factors that led to his election to the Board. Mr. Hawkins has served on the board of directors of the Self Insurance Institute of America, Ronald McDonald House of Little Rock, Texas Self Insured Association, and as chairman of the advisory board of Certergy Inc.

I.    History of the Case.

The Debtors filed for bankruptcy protection on March 8, 2016, primarily as a result of Independent Bank. The firm of Spector & Johnson, PLLC was appointed bankruptcy counsel for the Debtors by Order of the Bankruptcy Court entered on April 21, 2016.

The Debtors sought and obtained approval of a sale and bidding process (the "**Sale Process**") to ensure that their estates realize the maximum value for the Debtors' assets. As part of the Sale Process, the Debtors developed and obtained approval of bidding procedures ("**Bidding Procedures**"). Specifically, on June 22, 2016, the Court entered the Order Approving Sale and Bidding Procedures in Connection with Sale of Assets of the Debtors and Granting Related Relief [Docket No 118] (the "**Bidding Procedures Order**"), including procedures governing the Debtors' assumption and assignment of any Assumed and Assigned Contract.[2] The Sale Process was managed by Northland Securities, Inc. the Debtors' approved investment banker. Black Mountain Operating, LLC was the ultimate purchaser of certain assets of the Debtors for the purchase price of $6.7 million. Pursuant to subsequent orders of the Bankruptcy Court, the Allowed Secured Claims of Independent Bank and royalty interest holders relating to the purchased assets were paid from the sale proceeds.

The Debtors also were involved in substantial litigation during the bankruptcy case with Black Shale. In April 2016, Black Shale attempted to permit Black Shale to replace the Debtors as operator of certain properties which the Debtors co-owned with Black Shale. The Bankruptcy Court denied Black Shale's request for emergency relief as well as the remaining relief requested by Black Shale after an extended hearing in September of 2016. Nevertheless, the dispute between Black Shale and the Debtors continued through 2018. Specifically, as the owner of the undivided 50% interest in certain of the Debtors' oil and gas leases and related interests, Black Shale was obligated to pay joint interest billings which now exceed $500,000.00. Despite this obligation, Black Shale remained delinquent in such payments at all times post-petition. Accordingly, in September 2017, Cross Border filed lawsuits in New Mexico state courts (including any proceeding removed from Federal Court or transferred, the "**New Mexico Litigation**") seeking money damages and foreclosure of Black Shale's interest in certain oil and gas leases. Black Shale answered the New Mexico Litigation and asserted defenses to Cross Border's allegation regarding the payments required and the other allegations made in the New Mexico Litigation. Black Shale also removed the New Mexico Litigation to the United States District Court for the District of New Mexico. On January 8, 2018, the United States District Court for the District of New Mexico ordered the transfer of the New Mexico Litigation to the Northern District of Texas.

In March 2018, Black Shale and the Debtors reached a resolution with respect to the New Mexico Litigation, the unpaid balance of Black Shale's joint interest billings, and certain amounts owed to Black Shale by the Debtors. The terms of the parties' agreement were memorialized in a comprehensive settlement agreement but resulted in the reconveyance of Black Shale's mineral interests within Lea, Roosevelt and Chaves Counties, New Mexico, and Ector County, Texas, and certain other property. The parties also entered into mutual releases except for certain remaining obligations of the Debtors and Black Shale related to specific environmental remediation. This settlement was approved by the Bankruptcy Court in April 2018.

---

[2] Capitalized terms used in this Section shall have the meaning ascribed to them in the Bidding Procedures Order.

The other major event which has occurred during the Chapter 11 Cases, is that the New Mexico Oil Conservation Division has required the Debtors to engage in unanticipated environmental remediation, and plugging and abandonment activities, which has diminished the Debtors available cash. While the Debtors believe that their near term environmental remediation, and plugging and abandonment are nearing completion, this unanticipated use of available cash has dramatically reduced amounts available for dividends to creditors in these Chapter 11 Cases.

J.    Description of Plan of Reorganization.

1.    General Summary

The Plan proposes a streamlining of the Debtors operations by eliminating Red Mountain's ownership of the operating subsidiaries, Black Rock, RMR, and Cross Border. If the Plan is confirmed, Red Mountain will be dissolved and all holders of Allowed Interests in Red Mountain will receive no distribution under the Plan. Red Mountain's ownership of its operating subsidiaries will be transferred to holders of Allowed Class 4RR Claims and Allowed Class 4CB Claims making the Stock Election and to the Plan Funder, StoneStreet.  Thus, Black Rock and RMR will become wholly-owned subsidiaries of Cross Border. Cross Border will be the new parent entity for the Reorganized Debtors owned by the Plan Funder, holders of Allowed Class 4RR Claims and Allowed Class 4CB Claims, and any other existing Allowed Interest Holders of Cross Border.

Allowed Secured Claims of Ad Valorem Taxing Authorities are paid in full without penalty accruing after the Petition Date.

Holders of claims entitled to priority are paid in full. Certain such holders, namely employees of RMR, are provided an option to participate as owners of the Reorganized Debtors by making the Stock Election.

Interest Burden Payees, Mineral Owners, and Black Shale are provided unimpaired treatment. That is, all rights of such parties existing under state law are preserved.

General Unsecured creditors of Black Rock and Red Mountain receive distributions from the Black Rock Available Cash and the Red Mountain Available Cash, the majority of which is being contributed by the Plan Funder. The Debtors predict that based upon the Debtors' Schedules, this will result in a 16% distribution to Holders of Allowed Class 6RD Claims and a 100% distribution to Holders of Allowed Class 6BR Claims. However, if unscheduled claims are allowed against either of these entities, distributions could be diminished. General Unsecured creditors of RMR receive no distribution. Holders of General Unsecured Claims against Cross Border are paid in full over a 10 year time horizon beginning one year after the Effective Date.

2.    Specific Treatment of Classes

a. *Classes 1RD, 1RR, 1CB and 1BR – Any Allowed Secured Claims of Ad Valorem Taxing Authorities.* The Plan provides that on the later of the Effective Date or the day upon which a Contested Class 1RD, 1RR, 1CB or 1BR Claim becomes Allowed, in full and final satisfaction of its Allowed Secured Claim, each holder of an Allowed Secured Claim in Class 1RD, 1RR, 1CB or 1BR shall receive a Cash payment equal to such Allowed Secured Claim without penalties accruing after the Petition Date. For purposes of calculating the amount of a Class 1 Allowed Secured Claim, Claims in Class 1RD, 1RR, 1CB or 1BR shall bear interest from the Petition Date through the Effective Date at the rate provided under applicable non-bankruptcy law. In the event of an objection to a Claim in this Class, any payments made to the holder of such Claim on account of such Claim while the objection is pending shall be applied to the undisputed amount of the Claim. Any Ad Valorem Taxing Authority shall retain its Liens to secure its Allowed Class 1RD, 1RR, 1CB or 1BR Claim until the Allowed Secured Claim is paid.

b. *Classes 2RD, 2RR, 2CB and 2BR – Any Allowed Claims of Interest Burden Payees.* The Plan provides that on the later of the Effective Date or the day upon which a Contested Class 2RD, 2RR, 2CB or 2BR Claim becomes Allowed, in full and final satisfaction of its Allowed Class 2RD, 2RR, 2CB or 2BR Claim, each holder of an Allowed Secured Claim in Class 2RD, 2RR, 2CB or 2BR shall receive a Cash payment equal to such Allowed Class 2RD, 2RR, 2CB or 2BR Claim, with interest as provided under applicable non-bankruptcy law. Notwithstanding any contractual provision or applicable law that entitles the holder of an Allowed Class 2RD, 2RR, 2CB or 2BR Claim to demand or receive accelerated payment of such claim after the occurrence of a default, unless an objection to Plan is received demanding cure of a specified default, entry of the Confirmation Order shall:

  i. be deemed to cure any default that occurred before or after the Petition Date, other than a default of a kind specified in Bankruptcy Code Section 365 [b][2];
  ii. reinstate the maturity of such Allowed Class 2RD, 2RR, 2CB or 2BR Claim as such maturity existed before such default;
  iii. finally determine that no compensation is due the holder of such Allowed Class 2RD, 2RR, 2CB or 2BR Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, including but not limited to any attorney's fees or costs associated with enforcement of such Interest Burden Payee's Allowed Class 2RD, 2RR, 2CB or 2BR Claim; and

iv. otherwise leave unaltered the legal, equitable, or contractual rights of such holder of such Allowed Class 2RD, 2RR, 2CB or 2BR Claim.

c. *Class 3RD[A] through 3RD[Z], 3RR[A] through 3RR[Z], 3CB[A] through 3CB[Z], and 3BR[A] through 3BR[Z] –Any Allowed Secured Claims not Otherwise Classified.* The Plan provides that on the later of the Effective Date or the day upon which a Contested Class 3RD, 3RR, 3CB or 3BR Claim becomes Allowed, in full and final satisfaction of its Allowed Class 3RD, 3RR, 3CB or 3BR Claim, each holder of an Allowed Class 3RD, 3RR, 3CB or 3BR Claim against a Debtor, shall receive, at the applicable Reorganized Debtor's option, either [i] a Cash payment in the amount of such holder's Allowed Class 3RD, 3RR, 3CB or 3BR Claim; [ii] payment pursuant to the pre-Petition Date agreements between such holder and such applicable Debtor and retention of its Liens to secure the payment of the Allowed Class 3RD, 3RR, 3CB or 3BR Claim, or [iii] the surrender to such holder of all Collateral securing such Allowed Class 3RD, 3RR, 3CB or 3BR Claim  in accordance with *In re Sandy Ridge Development Corp*, 881 F.2d 1346 [5th Cir. 1989], in which case such Allowed Class 3RD, 3RR, 3CB or 3BR Claim shall be deemed paid in full and fully satisfied and any deficiency thereon shall be treated as a Class 6 General Unsecured Claim against the Debtor which is liable for the Allowed Class 3 Claim.  For purposes of the Plan, each Allowed Class 3RD, 3RR, 3CB or 3BR Claim shall be deemed separately classified into a subclass by Debtor [*e.g.*, 3RD[A], 3RD[B], 3RR[A], 3RR[B], 3CB[A], 3CB[B], 3BR[A], 3BR[B]] and the election made above made be made independently as to each such subclass.  In the event that a Reorganized Debtor elects to provide the treatment referenced under [ii] of this paragraph, and notwithstanding any contractual provision or applicable law that entitles the holder of an Allowed Class 3RD, 3RR, 3CB or 3BR Claim to demand or receive accelerated payment of such claim after the occurrence of a default, unless an objection to Plan is received demanding cure of a specified default, entry of the Confirmation Order shall:

i. be deemed to cure any default that occurred before or after the Petition Date, other than a default of a kind specified in Bankruptcy Code Section 365 [b][2];

ii. reinstate the maturity of such Allowed Class 3RD, 3RR, 3CB or 3BR Claim as such maturity existed before such default;

iii. finally determine that no compensation is due the holder of such Allowed Class 3RD, 3RR, 3CB or 3BR Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law including but not limited to any attorney's fees or costs associated with enforcement

of such holder's Allowed Class 3RD, 3RR, 3CB or 3BR Claim; and

iv. otherwise leave unaltered the legal, equitable, or contractual rights of such holder of such Allowed Class 3RD, 3RR, 3CB or 3BR Claim.

d. Notwithstanding the foregoing, the Reorganized Debtors and any holder of an Allowed Secured Claim may agree to any alternate treatment of such Secured Claim, which treatment shall include preservation of such holder's Lien; provided, however, that such treatment shall not provide a return to such holder of an amount having a present value in excess of the amount of such holder's Allowed Secured Claim. Each such agreement shall be presented to the Bankruptcy Court before or within 90 days after the Effective Date and shall not materially and adversely impact the treatment of any other creditor under the Plan.

e. *Class 4RD – Any Allowed Priority Non-Tax Claim Against Red Mountain.* The Plan provides that on the later of the Effective Date or the day upon which a Contested Class 4RD Claim becomes Allowed, in full and final satisfaction of its Allowed Class 4RD Claim, each holder of an Allowed Claim in Class 4RDshall receive a Cash payment equal to such Allowed Class 4RD Claim.

f. *Class 4RR – Any Allowed Priority Non-Tax Claim Against RMR.* The Plan provides that on the later of the Effective Date or the day upon which a Contested Class 4RR Claim becomes Allowed, in full and final satisfaction of its Allowed Class 4RR Claim, each holder of an Allowed Claim in Class 4RR shall receive at the option of the holder of the Allowed Class 4RR Claim either [i] a Cash payment equal to such Allowed Class 4RR Claim; or [ii] a Pro Rata Share of 5% of the Equity Interest in Cross Border calculated based upon the total Allowed amount of each holder of an Allowed Class 4RR Claim and Allowed Class 4CB Claim making the Stock Election. Any holder of an Allowed Class 4RR Claim making the Stock Election shall receive no distribution on such holder's Allowed Class 6RR Claim.

g. *Class 4CB – Any Allowed Priority Non-Tax Claim Against Cross Border.* The Plan provides that on the later of the Effective Date or the day upon which a Contested Class 4CB Claim becomes Allowed, in full and final satisfaction of its Allowed Class 4CB Claim, each holder of an Allowed Claim in Class 4CB shall receive at the option of the holder of the Allowed Class 4CB Claim either [i] a Cash payment equal to such Allowed Class 4CB Claim; or [ii] a Pro Rata Share of 5% of the Equity Interest in Cross Border calculated based upon the total Allowed amount of each holder of an Allowed Class 4RR Claim and Allowed Class 4CB

Claim. Any holder of an Allowed Class 4CB Claim making the Stock Election shall receive no distribution on such holder's Allowed Class 6CB Claim.

h. *Classes 5– Any Allowed Claims of Black Shale.* The Plan provides that Black Shale shall retain all rights under its agreements with the Debtors. Confirmation of the Plan shall

   i.   be deemed to cure any default that occurred before or after the Petition Date, other than a default of a kind specified in Bankruptcy Code Section 365 [b][2];
   ii.  reinstate the maturity of such Allowed Class 5 Claim as such maturity existed before such default;
   iii. finally determine that no compensation is due the holder of such Allowed Class 5 Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law including but not limited to any attorney's fees or costs associated with enforcement of such holder's Allowed Class 5 Claim; and
   iv.  otherwise leave unaltered the legal, equitable, or contractual rights of such holder of such Allowed Class 5 Claim.

a. *Class 6RD –Any Allowed General Unsecured Claims against Red Mountain.* The Plan provides that on the later of the Effective Date or the day upon which a Contested General Unsecured Claim in Class 6RD becomes Allowed, each holder of an Allowed General Unsecured Claim in Class 6RD shall receive, in full and final satisfaction of such Allowed Claim, a Cash payment equal to its Pro Rata Share of the Red Mountain Available Cash.

b. *Class 6RR –Any Allowed General Unsecured Claims against RMR.* The Plan provides that on holders of Allowed Claims in Class 6RR shall receive no distribution on account of their Claims.

c. *Class 6CB – Any Allowed General Unsecured Claims against Cross Border.* The Plan provides that on the later of the Effective Date or the day upon which a Contested General Unsecured Claim in Class 6CB becomes Allowed, each holder of an Allowed General Unsecured Claim in Class 6CB shall receive, in full and final satisfaction of such Allowed Claim, deferred quarterly Cash payments beginning one [1] year following the Effective Date and ending on the 11th anniversary of the Effective Date in an amount necessary to amortize such holder's Allowed Class 6CB Claim over a eleven [11] year period with interest at the Federal Judgment Rate.

d.  *Class 6BR –Any Allowed General Unsecured Claims against Black Rock.* The Plan provides that on the later of the Effective Date or the day upon which a Contested General Unsecured Claim in Class 6BR becomes Allowed, each holder of an Allowed General Unsecured Claim in Class 6BR shall receive, in full and final satisfaction of such Allowed Claim, a Cash payment in equal to its Pro Rata share of the Black Rock Available Cash.

e.  *Class 7RD –Equity Interests in Red Mountain.* The Plan provides that on existing Equity Interests in Red Mountain will be extinguished. Accordingly, holders of Class 7RD Equity Interests will not retain their Equity Interests in Red Mountain. Red Mountain will be dissolved under applicable non-bankruptcy law.

f.  *Class 7RR – Equity Interests in RMR.* The Plan provides that Equity Interests in RMR held by Red Mountain will be transferred to Cross Border.

g.  *Class 7CB – Equity Interests in Cross Border.* The Plan provides that (i) 5% of the Equity Interests in Cross Border held by Red Mountain will be transferred to holders of Allowed Class 4RR Claims and Allowed Class 4CB Claims making the Stock Election; (ii) the remaining 78% of the Equity Interests in Cross Border held by Red Mountain will be transferred to the Plan Funder; and (ii) any other Holders of Equity Interests in Class 7CB will retain their Equity Interests in Cross Border.

h.  *Class 7BR – Equity Interests in Black Rock.* The Plan provides that all Equity Interests in Black Rock held by Red Mountain will be transferred to Cross Border.

i.  *Class 8- Any Allowed Claims of Mineral Owners.* The Plan provides that Mineral Owners shall retain all rights under their agreements with the Debtors. Confirmation of the Plan shall

   i.   be deemed to cure any default that occurred before or after the Petition Date, other than a default of a kind specified in Bankruptcy Code Section 365 [b][2];

   ii.  reinstate the maturity of such Allowed Class 8 Claim as such maturity existed before such default;

   iii. finally determine that no compensation is due the holder of such Allowed Class 8 Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law including but not limited to any attorney's fees or costs associated with enforcement of such holder's Allowed Class 8 Claim; and

iv.    otherwise leave unaltered the legal, equitable, or contractual rights of such holder of such Allowed Class 8 Claim.

K.    Feasibility Analysis.

The management of the Debtors has prepared the projected financial information attached hereto as "**Exhibit B**" [the "**Projections**"] in connection with the development of the Plan to present the projected effects of the Plan and the payments contemplated hereby. Based on these Projections, the Debtors believe that the Plan is feasible.

L.    Executory Contracts.

The Plan constitutes a motion to assume, as of the Effective Date, all Contracts. Except as set forth in such motions or Orders of the Bankruptcy Court, as to assumed Contracts, [a] no cure of such Contracts pursuant to Bankruptcy Code section 365[b][1][A] is necessary other than the Cure Payments; [b] no Bankruptcy Code section 365[b][1][B] compensation is owing or shall be owing upon the assumption of such Contracts; [c] confirmation of the Plan shall be deemed [i] adequate assurance of prompt cure of any default under such Contracts solely based upon a Debtor's obligation in the Plan to make the Cure Payments, [ii] adequate assurance of future performance under such Contracts, and [iii] consent by the party to such Contract to the assignment or sublease of the property subject to the Contract to any third party disclosed at the Confirmation Hearing.

M.    Retention of Jurisdiction.

The Bankruptcy Court's jurisdiction shall be retained under the Plan as set forth in Article 11 of the Plan.

N.    Alternatives to Plan Including Liquidation/Liquidation Analysis.

Although the Debtors combined have approximately $1.4 million in combined cash and cash equivalents, approximately $650,000 is in the form of restricted cash. In the event of a liquidation, the Debtors believe that all the restricted cash and any unrestricted cash would be consumed paying the contingent claims of the New Mexico Oil Conservation Division for plugging and capping liabilities attendant to the Debtors' cessation of operations. Accordingly, the Debtors do not believe that holders of Allowed General Unsecured Claims would receive any distribution in the event of liquidation.

O.    Risks To Creditors Under The Plan.

The Plan is subject to a number of material risks, including those enumerated below. Prior to deciding how to vote on the Plan, each holder of an impaired Claim should carefully consider all of the information contained in this Disclosure Statement, especially the factors mentioned in the following paragraphs:

1.     Forward-Looking Information May Prove Inaccurate – This Disclosure Statement contains various forward-looking statements and information that are based on the Debtors' beliefs as well as assumptions made by and information currently available to the Debtors.  These forward-looking statements are only predictions and are not guarantees of performance. These statements generally relate to the Debtors' plans, objectives and expectations for future operations and are based on management's current beliefs and assumptions, which in turn are based on its experience and its perception of historical trends, current conditions and expected future developments as well as other factors it believes are appropriate under the circumstances. Although the Debtors believe that the plans, objectives and expectations reflected in or suggested by the forward-looking statements are reasonable, there can be no assurance that actual results will not differ materially from those expressed or implied in such forward-looking statements. Forward-looking statements also involve risks and uncertainties. Many of these risks and uncertainties are beyond the Debtors' ability to control or predict and could cause results to differ materially from the results discussed in such forward-looking statements. Such risks and uncertainties include, but are not limited to, the following:

    a.  the substantial and continued decline in oil prices;

    b.  the ability to generate sufficient cash flow from operations, borrowings or other sources to enable the Debtors to fully develop and produce the Debtors' oil and natural gas properties;

    c.  declines or volatility in the prices received for the Debtors' oil and natural gas;

    d.  general economic conditions, whether internationally, nationally or in the regional and local market areas in which the Debtors do business;

    e.  risks associated with drilling, including completion risks, cost overruns and the drilling of non-economic wells or dry holes;

    f.  uncertainties associated with estimates of proved oil and natural gas reserves;

    g.  the presence or recoverability of estimated oil and natural gas reserves and the actual future production rates and associated costs;

    h.  potential defects in title to the Debtors' properties;

    i.  cost and availability of drilling rigs, equipment, supplies, personnel and oilfield services;

    j.  geological concentration of the Debtors' reserves;

    k.  environmental or other governmental regulations, including legislation of hydraulic fracture stimulation;

    l.  our ability to secure firm transportation for oil and natural gas the Debtors produce and to sell the oil and natural gas at market prices;

    m.  exploration and development risks;

    n.  management's ability to execute the Debtors' plans to meet the Debtors' goals;

    o.  our ability to retain key members of the Debtors' management team;

p. weather conditions;

q. actions or inactions of third-party operators of the Debtors' properties;

r. costs and liabilities associated with environmental, health and safety laws;

s. our ability to find and retain highly skilled personnel;

t. operating hazards attendant to the oil and natural gas business;

u. competition in the oil and natural gas industry; and

v. the other factors discussed in this Disclosure Statement.

Moreover, forward-looking statements speak only as of the date hereof. All such forward-looking statements and any subsequent written and oral forward-looking statements attributable to the Debtors or any person acting on the Debtors' behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in this section and any other cautionary statements that may accompany such forward-looking statements. Except as otherwise required by applicable law, the Debtors disclaim any duty to update any forward-looking statements.

2.  Competition -- The oil and natural gas industry is highly competitive and the Debtors compete with a substantial number of other companies that have greater resources than the Debtors do. The largest of these companies explore for, produce and market oil and natural gas, carry on refining operations and market the resultant products on a worldwide basis. The primary areas in which the Debtors encounter substantial competition are in the Debtors' drilling and development operations, locating and acquiring prospective oil and natural gas properties and reserves and attracting and retaining highly skilled personnel. There is also competition between producers of oil and natural gas and other industries producing alternative energy and fuel. Furthermore, competitive conditions may be substantially affected by various forms of energy legislation and/or regulation considered from time to time by the United States government; however, it is not possible to predict the nature of any such legislation or regulation that may ultimately be adopted or its effects upon the Debtors' future operations. Such laws and regulations may, however, substantially increase the costs of exploring for, developing or producing oil and natural gas and may prevent or delay the commencement or continuation of a given operation. The effect of these risks cannot be accurately predicted.

3.  Insurance – The Debtors currently maintain oil and natural gas commercial general liability protection relating to all of the Debtors' oil and natural gas operations (including environmental and pollution claims).  As is common in the oil and natural gas industry, the Debtors will not insure fully against all risks associated with the Debtors' business either because such insurance is not available or because premium costs are considered prohibitive. In addition, pollution and environmental risks generally are not fully insurable. A loss not fully covered by insurance could have a material adverse effect on the Debtors' business, financial condition and results of operations.

4.  Environmental Matters and Regulation -- The Debtors' exploration, development and production operations are subject to various federal, state and local laws and regulations governing health and safety, the discharge of materials into the environment or otherwise relating to environmental protection. These laws and regulations may, among other things: require the

acquisition of permits to conduct exploration, drilling and production operations; govern the amounts and types of substances that may be released into the environment in connection with oil and natural gas drilling and production; restrict the way the Debtors handle or dispose of the Debtors' wastes or of naturally occurring radioactive materials generated by the Debtors' operations; cause the Debtors to incur significant capital expenditures to install pollution control or safety related equipment operating at the Debtors' facilities; limit or prohibit construction or drilling activities in sensitive areas such as wetlands, wilderness areas or areas inhabited by endangered or threatened species; impose specific health and safety criteria addressing worker protection; require investigatory and remedial actions to mitigate pollution conditions caused by the Debtors' operations or attributable to former operations; impose obligations to reclaim and abandon well sites and pits and impose substantial liabilities on the Debtors for pollution resulting from the Debtors' operations. Failure to comply with these laws and regulations may result in the assessment of administrative, civil and criminal penalties, the imposition of remedial obligations and the issuance of orders enjoining some or all of the Debtors' operations in affected areas.

Additionally, the United States Congress and federal and state agencies frequently revise environmental, health and safety laws and regulations, and their interpretations thereof, and any changes that result in more stringent and costly operational requirements or waste handling, disposal, cleanup and remediation requirements for the oil and natural gas industry could have a significant impact on the Debtors' operating costs. The trend in environmental regulation is to place more restrictions and limitations on activities that may affect the environment, and thus, any changes in environmental laws and regulations or new interpretations of enforcement policies that result in more stringent and costly waste handling, storage, transport, disposal or remediation requirements could have a material adverse effect on the Debtors' financial condition and results of operations. The Debtors may be unable to pass on such increased compliance costs to the Debtors' customers.

The oil and natural gas industry is extensively regulated by numerous federal, state and local authorities. In particular, oil and natural gas production and related operations are, or have been, subject to price controls, taxes and numerous other laws and regulations. These laws and regulations may also restrict the rate of oil and natural gas production below the rate that would otherwise be possible. The regulatory burden on the oil and natural gas industry increases the cost of doing business in the industry and consequently affects profitability.

Failure to comply with applicable laws and regulations can result in substantial penalties and possibly cessation of drilling and production operations. The regulatory burden on the industry increases the cost of doing business and affects profitability. The Debtors believe that the Debtors are in substantial compliance with existing requirements and such compliance will not have a material adverse effect on the Debtors' financial condition, cash flows or results of operations. Nevertheless, such laws and regulations are frequently amended or reinterpreted. Therefore, the Debtors are unable to predict the future costs or impact of compliance. Additional proposals and proceedings that affect the oil and natural gas industry are regularly considered by the United States Congress, the states, and the courts. The Debtors cannot predict when or whether any such proposals may become effective.

5.     Capital Requirements -- The oil and natural gas industry is capital intensive. The Debtors make and expect to continue to make significant capital expenditures in the Debtors' business for the exploration, development, production and acquisition of oil and natural gas reserves. Improvement in commodity prices may result in an increase in the Debtors' actual capital expenditures.  The payments to holders of Allowed Class 6CB Claims will require the Debtors to raise capital.  If the Debtors are unable to do so, the Debtors' operations on acceptable terms or at all, the Debtors may be forced to sell assets or curtail or suspend the Debtors' operations, and the Debtors' business, financial condition and results of operations may be materially and adversely affected.

6.     Operational Risks – The Debtors' cash flows from operations and access to capital are subject to a number of variables, including:

a.  the value of the Debtors' proved reserves;

b.  the level of oil and natural gas the Debtors are able to produce from existing wells;

c.  the prices at which the Debtors' oil and natural gas are sold;

d.  the Debtors' ability to acquire, locate and produce new reserves;

If sufficient capital resources are not available, the Debtors might be forced to cease operations entirely, curtail developmental and exploratory drilling and other activities or be forced to sell some assets on an untimely or unfavorable basis, which would have a material adverse effect on the Debtors' business, financial condition and results of operations.

7.     Commodity Risks -- The Debtors' revenue, profitability, access to capital and future rate of growth are substantially dependent on the prevailing prices of, and demand for, oil and natural gas. These process are in turn dependent on factors outside the Debtors' control, including but not limited to:

a.  the price and quantity of imports of foreign oil and natural gas;

b.  the actions of the Organization of Petroleum Exporting Countries, or OPEC, and other state-controlled oil companies relating to oil and natural gas price and production control;

c.  political conditions in or affecting other oil-producing and natural gas-producing countries, including the current conflicts in the Middle East and conditions in South America and Russia;

d.  the level of global oil and natural gas inventories;

e.  localized supply and demand fundamentals;

f.  the availability of refining capacity;

g.  price and availability of transportation and pipeline systems with adequate capacity;

h.  weather conditions and natural disasters;

i.  governmental regulations;

    j.   speculation as to the future price of oil and natural gas and the speculative trading of oil and natural gas futures contracts;

    k.   price and availability of competitors' supplies of oil and natural gas;

    l.   energy conservation and environmental measures;

    m.  technological advances affecting energy consumption;

    n.   the price and availability of alternative fuels and energy sources; and

    o.   domestic and international drilling activity.

If oil and natural gas prices are depressed or further decline, (i) the Debtors' net cash flow attributable to current production will decline, (ii) the Debtors' exploration and development activity may decline as some investments may become uneconomic and are either delayed or eliminated, and (iii) the value of proved developed producing reserves and proved undeveloped reserves could decline. It is impossible to predict future oil and natural gas price movements, and declines in oil and natural gas prices could have a material adverse effect on the Debtors' liquidity and financial condition.

8.      Production Risks -- Prospects that the Debtors decide to drill that do not yield oil or natural gas in commercially productive quantities will adversely affect the Debtors' financial condition and results of operations. The Debtors' prospects are in various stages of evaluation, and may range from a prospect which is ready to drill to a prospect that will require substantial additional seismic data processing and interpretation and other technical analysis. There is no way to predict in advance of drilling and testing whether any particular prospect will yield oil or natural gas in sufficient quantities to recover drilling or completion costs or to be commercially productive. The use of seismic data and other technologies and the study of producing fields in the same area will not enable the Debtors to know conclusively prior to drilling whether oil or natural gas will be present or, if present, whether oil or natural gas will be present in commercial quantities. The Debtors cannot assure that the analogies the Debtors draw from available data from other wells, more fully explored prospects or producing fields will be applicable to the Debtors' drilling prospects.

9.      Reserve Estimate Risks -- The calculation of reserves and estimating reserves are inherently imprecise. The accuracy of any reserve estimate is a function of the quality of available data, engineering interpretation and judgment and the assumptions used regarding the quantities of recoverable oil and natural gas and the future prices of oil and natural gas. Petroleum engineers consider many factors and make many assumptions in estimating reserves. Those factors and assumptions include, but are not limited to, the following: historical production from the area compared with production rates from similarly situated producing areas; the effects of governmental regulation; assumptions about future commodity prices, production and taxes; the availability of enhanced recovery techniques; and relationships with landowners, working interest partners, pipeline companies and others.

Any material inaccuracies in the Debtors' reserve estimates or underlying assumptions could materially affect the quantities and present values of the Debtors' reserves. The process of estimating oil and natural gas reserves is complex. It requires interpretations of available

technical data and various assumptions, including assumptions relating to economic factors. The process of preparing these estimates requires the projection of production rates and timing of development expenditures and analysis of available geological, geophysical, production and engineering data, and the extent, quality and reliability of this data can vary. The process also requires economic assumptions relating to matters such as oil and natural gas prices, drilling and operating expenses, capital expenditures, taxes and availability of funds.

10. Other Risks Inherent to the Industry

a. The Debtors' future financial condition and results of operations will depend on the success of the Debtors' acquisition, exploitation, development and production activities. The Debtors' oil and natural gas exploration and production activities are subject to numerous risks beyond the Debtors' control, including the risk that drilling will not result in commercially productive oil or natural gas reservoirs. The Debtors' decisions to acquire, explore, develop or otherwise exploit drilling locations or properties will depend in part on the evaluation of data obtained through geophysical and geological analyses, production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations. In addition, the Debtors' cost of drilling, completing and operating wells is often uncertain before drilling commences. Overruns in budgeted expenditures are common risks that can make a particular project uneconomical. Further, many factors may curtail, delay or cancel the Debtors' scheduled drilling projects, including the following:

    i. shortages of or delays in obtaining equipment and qualified personnel;

    ii. facility or equipment malfunctions;

    iii. unexpected operational events;

    iv. pressure or irregularities in geological formations;

    v. adverse weather conditions, such as flooding;

    vi. reductions in oil and natural gas prices;

    vii. delays imposed by or resulting from compliance with regulatory requirements;

    viii. proximity to and capacity of transportation facilities;

    ix. title problems;

    x. limitations in the market for oil and natural gas; and

    xi. costs and availability of drilling rigs, equipment, supplies, personnel and oilfield services.

b. Even if drilled, the Debtors' completed wells may not produce reserves of oil or natural gas that are commercially productive or that meet the

Debtors' earlier estimates of economically recoverable reserves. A productive well may become uneconomic if water or other deleterious substances are encountered, which impair or prevent the production of oil and/or natural gas from the well. The Debtors' overall drilling success rate or the Debtors' drilling success rate for activity within a particular project area may decline. Unsuccessful drilling activities could result in a significant decline in the Debtors' production and revenues and materially harm the Debtors' operations and financial condition by reducing the Debtors' available cash and resources.

c.      The Debtors' future success will depend on the Debtors' ability to find, develop or acquire additional reserves that are commercially productive. If the Debtors are unable to replace reserves through drilling or acquisitions, the Debtors' level of production and cash flows will be adversely affected. In general, production from oil and natural gas properties declines as reserves are depleted, with the rate of decline depending on reservoir characteristics. The Debtors' total proved reserves decline as reserves are produced unless the Debtors conduct other successful exploration and development activities or acquire properties containing proved reserves, or both. The Debtors' ability to make the necessary capital investment to maintain or expand the Debtors' asset base of oil and natural gas reserves would be impaired to the extent cash flow from operations is reduced and external sources of capital become limited or unavailable. The Debtors may not be successful in exploring for, developing or acquiring additional reserves. The Debtors also may not be successful in raising funds to acquire, explore or develop additional reserves.

d.      The Debtors implement hydraulic fracturing in the Debtors' operations, a process involving the injection of fluids-usually consisting mostly of water but typically including small amounts of several chemical additives-as well as sand in order to create fractures extending from the wellbore through the rock formation to enable oil or natural gas to move more easily through the rock pores to a production well. Risks inherent to the Debtors' industry include the potential for significant losses associated with damage to the environment. Equipment design or operational failures, or vehicle operator error can result in explosions and discharges of toxic gases, chemicals and hazardous substances, and, in rare cases, uncontrollable flows of natural gas or well fluids into environmental media, as well as personal injury, loss of life, long-term suspension or cessation of operations and interruption of the Debtors' business and/or the business or livelihood of third parties, damage to geologic formations, environmental media and natural resources, equipment and/or facilities and property. In addition, the Debtors use and generate hazardous substances and wastes in the Debtors' operations and may become subject to claims relating to the release of such substances into the environment. In addition, some of the Debtors' current properties could contain currently unknown

contamination that could expose the Debtors to governmental requirements or claims relating to environmental remediation, personal injury and/or property damage. These conditions could expose the Debtors to liability for personal injury, wrongful death, property damage, loss of oil and natural gas production, pollution and other environmental damages and could materially impair the Debtors' profitability, competitive position or viability. Depending on the frequency and severity of such liabilities or losses, it is possible that the Debtors' operating costs, insurability and relationships with employees and regulators could be materially impaired.

e.    The Debtors' leasehold acreage may be subject to existing oil and natural gas leases, liens for current taxes and other burdens, including other mineral encumbrances and restrictions customary in the oil and natural gas industry, that should not materially interfere with the use or otherwise affect the value of such properties. However, the Debtors cannot guarantee that the Debtors have or will have clear and unobstructed title to leases or other rights assigned to us. The Debtors also cannot guarantee that the mineral encumbrances and restrictions mentioned above will not materially interfere with the use of or affect the value of leasehold acreage. Any cloud on the title of the working interests, leases and other rights owned by the Debtors could have a material adverse effect on the Debtors' operations.

f.    Market conditions, the unavailability of satisfactory oil and natural gas transportation or the remote location of the Debtors' drilling operations may restrict the Debtors' access to oil and natural gas markets or delay production. The availability of a ready market for oil and natural gas production depends on a number of factors, including the demand for and supply of oil and natural gas, the proximity of reserves to pipelines or trucking and terminal facilities and the availability of trucks and other transportation equipment. The Debtors may be required to shut-in wells or delay initial production for lack of a viable market or because of inadequacy or unavailability of pipeline or gathering system capacity. When that occurs, the Debtors will be unable to realize revenue from those wells until the production can be tied to a gathering system. This can result in considerable delays from the initial discovery of a reservoir to the actual production of the oil and natural gas and realization of revenues.

g.    The Debtors' operations are susceptible to damage from natural disasters such as flooding or tornados, which involve increased risks of personal injury, property damage and marketing interruptions. The occurrence of one of these operating hazards may result in injury, loss of life, suspension of operations, environmental damage and remediation and/or governmental investigations and penalties. The payment of any of these liabilities could reduce, or even eliminate, the funds available for exploration and development, or could result in a loss of the Debtors'

properties. In addition, pollution and environmental risks generally are not fully insurable. If a significant accident or other event occurs and is not fully covered by insurance, it could materially adversely affect the Debtors' financial condition, results of operations and cash flows.

h.  The oil and natural gas industry is characterized by rapid and significant technological advancements and introductions of new products and services using new technologies. As others use or develop new technologies, the Debtors may be placed at a competitive disadvantage or competitive pressures may force the Debtors to implement these new technologies at substantial costs. In addition, other oil and natural gas companies may have greater financial, technical and personnel resources that allow them to enjoy technological advantages and may in the future allow them to implement new technologies before the Debtors can. The Debtors may not be able to respond to these competitive pressures and implement new technologies on a timely basis or at an acceptable cost. If one or more of the technologies the Debtors use now or in the future were to become obsolete or if the Debtors are unable to use the most advanced commercially available technology, the Debtors' business, financial condition and results of operations could be materially adversely affected.

i.  The Debtors operate in a highly competitive environment for developing and acquiring properties, marketing oil and natural gas and securing equipment and trained personnel. As a relatively small oil and natural gas company, many of the Debtors' competitors, major and large independent oil and natural gas companies, possess and employ financial, technical and personnel resources substantially greater than ours. Those companies may be able to develop and acquire more prospects and productive properties than the Debtors' financial or personnel resources permit. The Debtors' ability to acquire additional prospects and discover reserves in the future will depend on the Debtors' ability to evaluate and select suitable properties and execute the Debtors' exploration and development activities in a highly competitive environment. Also, there is substantial competition for capital available for investment in the oil and natural gas industry. Larger competitors may be better able to withstand sustained periods of unsuccessful drilling and absorb the burden of changes in laws and regulations more easily than the Debtors can, which would adversely affect the Debtors' competitive position. The Debtors may not be able to compete successfully in the future in developing reserves, acquiring prospective oil and natural gas properties and reserves, attracting and retaining highly skilled personnel and raising additional capital.

11.  Dependence on Key Individuals – The Debtors are dependent on their ability to retain the services of Alan Barksdale. The loss of Mr. Barksdale could have a material adverse effect on the Debtors.

12.    Certain Risks of Non-Confirmation – There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of the distributions to non-accepting creditors and interest holders will not be less than the value of the distributions that such creditors and interest holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that these requirements will be satisfied, there can be no assurance that the Court will concur.  The confirmation and consummation of the Plan are also subject to certain other conditions, which are described in this Disclosure Statement. If the Plan were not to be confirmed and consummated, it is unclear whether a reorganization comparable to the reorganization contemplated hereby could be implemented in a timely manner and, if so, what distributions holders of Claims ultimately would receive with respect to its Claims.  Moreover, if an alternative reorganization could not be implemented in a timely manner, it is possible the that Debtors would have to liquidate their assets, in which case it is likely the holders of Claims would receive less than they would have received pursuant to the Plan.

P.    <u>Tax Consequences to the Debtors</u>.

Implementation of the Plan may result in federal income tax consequences to holders of Claims and Equity Interest holders.  Tax consequences to a particular Creditor or holder of an Equity Interest may depend on the particular circumstances or facts regarding the Claim or the holder of the Equity Interest. YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN UNDER FEDERAL AND APPLICABLE STATE AND LOCAL TAX LAWS.

Q.    <u>Pending or Anticipated Litigation</u>.

On the Effective Date, all pre-Petition Date lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of a Claim shall be dismissed as to the Reorganized Debtors; provided however, if the appeal of any such matter is pending as of the Confirmation Date, the Claim shall be determined by the appellate court[s] in which such case is pending; provided further that if such case is reversed or remanded to the trial court, the Claim shall be asserted in the Chapter 11 Cases and finally determined by the Bankruptcy Court.

Dismissals of proceedings provided herein shall be with prejudice to the assertion of such Claim in any manner other than as prescribed by the Plan.  ALL PARTIES TO ANY SUCH ACTION SHALL BE ENJOINED BY THE BANKRUPTCY COURT IN THE CONFIRMATION ORDER FROM TAKING ANY ACTION TO IMPEDE THE IMMEDIATE AND UNCONDITIONAL DISMISSAL OF SUCH ACTIONS.  Confirmation and consummation of the Plan shall have no effect on insurance policies of either of the Debtors in which either of the Debtors is or was the insured party; and the Reorganized Debtors shall become the insured party under any such policies.  Each insurance company is prohibited from,

and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to the Debtors' bankruptcy, the Plan or any provision within the Plan, including the treatment or means of liquidation set out within the Plan.

R.    Exculpations.

The Debtors, the Reorganized Debtors, and their respective directors, officers, employees, predecessors, successors, attorneys, accountants, financial advisors, appraisers, representatives and agents, acting in such capacity, shall neither have nor incur any liability to any Entity for any act taken or omitted to be taken in connection with, related to or arising out of the Reorganization Cases or the consideration, formulation, preparation, dissemination, confirmation, effectuation, implementation or consummation of the Plan or any transaction proposed in connection with the Debtors, the Chapter 11 Cases or any contract, instrument, release or other agreement or document entered into or delivered, or any other act taken or omitted to be taken, in connection therewith; provided, however that the foregoing provisions of this Section shall have no effect on:  (a) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (b) the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

S.    Procedures For Resolving and Treating Contested Claims Under The Plan.

1.    Establishment of Contested Claims Reserve.  Notwithstanding any other provision of the Plan, no assets or property shall be distributed under the Plan on account of any Contested Claim. For all Contested Claims, the Reorganized Debtors shall establish and hold, in trust, distributions to be made on account of any Claim [each such reserve being herein called a "Contested Claims Reserve"] which is a Contested Claim, and shall place in each Contested Claims Reserve the assets and property to be distributed on account of such Contested Claims pursuant to the Plan, pending Allowance or Disallowance of such Claim.  Pending entry of a Final Order concerning a Contested Claim, the Reorganized Debtors shall pay into the Contested Claims Reserve all payments provided for under the Plan which would have been required to be delivered to the holder of the Contested Claim as if the Contested Claim were an Allowed Claim.  Cash held in any Contested Claims Reserve shall be held in a segregated interest-bearing trust account.  To the extent practicable, the Reorganized Debtors may invest the Cash in any Contested Claims Reserve in a manner that will yield a reasonable net return, taking into account the safety of the investment.  Each Contested Claims Reserve shall be held in a federally-insured financial institution.  No funds shall be released from a Contested Claims Reserve absent an order from the Bankruptcy Court.

2.    Determination of Contested Claims Reserve.  The Debtors shall establish and fund a Contested Claims Reserve in respect of each Contested Claim in an amount asserted by the holder of a Contested Claim in a filed proof of claim, or if no proof of claim is filed, the amount, if any, set forth in the Debtor's Schedules.  Notwithstanding the foregoing, with respect

to any Contested Claim, the Debtors may seek to establish a different amount of the Contested Claims Reserve applicable to such Contested Claim after notice and opportunity for a hearing to the holder of the Contested Claim. The Bankruptcy Court may, at any time, including upon request of a party in interest, determine for each Contested Claim, the amount of assets and property sufficient to fund each Contested Claims Reserve established with respect to any such Claim. Any unsecured claimant holding a Contested Claim so estimated will have recourse only to undistributed assets and property in the Contested Claims Reserve to satisfy the Contested Claim and not to the Reorganized Debtors or any other assets or property, should the Allowed Claim of such claimant, as finally determined by a Final Order, exceed such Estimated Amount.

 3. Return of Assets. Except as otherwise provided herein, all assets and properties [and all interest payments and dividends previously paid in connection therewith] in any Contested Claims Reserve remaining after the resolution of all disputes relating thereto shall be returned to the Reorganized Debtors.

T. Discharge of the Debtors.

 Entry of the Confirmation Order shall discharge all existing debts and Claims of any kind, nature or description whatsoever against the Debtors or any of its assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code, including but not limited to Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date and all debts of the kind specified in sections 502[g], 502[h] or 502[i] of the Bankruptcy Code, whether or not [a] a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; [b] a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or [c] the holder of a Claim has accepted the Plan. As provided in section 524 of the Bankruptcy Code, the discharge shall void any judgment against the Debtors or Reorganized Debtors at any time obtained to the extent it relates to a Claim discharged and operates as an injunction against the prosecution of any action against the Debtors, the Reorganized Debtors, or any of their property, to the extent it relates to a Claim discharged. Notwithstanding anything to the contrary, Section 12.2 does not enjoin creditors from enforcing their rights under the Plan and does not apply to post-petition ad valorem taxes.

U. Injunctions.

 EXCEPT AS PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, ALL ENTITIES THAT HAVE HELD, CURRENTLY HOLD OR MAY HOLD A CLAIM OR OTHER DEBT OR LIABILITY THAT IS DISCHARGED PURSUANT TO THE TERMS OF THE PLAN SHALL BE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF ANY SUCH DISCHARGED CLAIM, DEBT OR LIABILITY:

 (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING AGAINST ANY DEBTOR OR REORGANIZED DEBTOR, OR ANY OF ITS PROPERTY, OTHER THAN TO ENFORCE ANY RIGHT TO A DISTRIBUTION

PURSUANT TO THE PLAN;

(II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST ANY DEBTOR OR REORGANIZED DEBTOR, OR ANY OF ITS PROPERTY, OTHER THAN AS PERMITTED PURSUANT TO (I) ABOVE;

(III) CREATING, PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE AGAINST ANY DEBTOR OR REORGANIZED DEBTOR, OR ANY OF ITS PROPERTY;

(IV) ASSERTING A SETOFF, RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO ANY DEBTOR OR REORGANIZED DEBTOR; AND

(V) COMMENCING OR CONTINUING ANY ACTION, IN ANY MANNER, IN ANY PLACE THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN.

V.    Conclusion.

Through confirmation of the Plan, the Debtors believe that it can resolve all claims that have been, or could be, asserted against it in a timely and cost effective manner.  The Debtors believe that the Plan provides a mechanism to resolve and provide just compensation to all claimants.  The Debtors believe that the Plan is fair to all parties-in-interest and should be approved by creditors.

THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE PLAN.

Dated: June 22, 2018.

Respectfully submitted,

By:    /s/ Howard Marc Spector
Howard Marc Spector
TBA #00785023
SPECTOR & JOHNSON, PLLC
Banner Place, Suite 1100
12770 Coit Road
Dallas, Texas 75251
[214] 365-5377
FAX: [214] 237-3380
EMAIL: hspector@spectorjohnson.com

COUNSEL FOR THE DEBTORS

Howard Marc Spector
TBA # 00785023
SPECTOR & JOHNSON, PLLC
12770 Coit Road, Suite 1100
Dallas, Texas 75251
(214) 365-5377
FAX: (214) 237-3380
Hspector@spectorjohnson.com

COUNSEL FOR THE DEBTORS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **RMR Operating, LLC, et al.,** | § | **CASE NO. 16-30988-11** |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |

---

Second Amended Joint Plan of Reorganization
Filed by the Debtors
Dated: June 22, 2018
Dallas, Texas

---

The Debtors, as debtors-in-possession, propose this Second Amended Joint Plan of Reorganization under chapter 11 of the Bankruptcy Code.

### ARTICLE 1: DEFINITIONS AND INTERPRETATION

**1.1** *Definitions.*

The capitalized terms used herein shall have the respective meanings set forth below:

(a) "**Ad Valorem Taxing Authority**" shall mean any governmental entity entitled by law to assess taxes on property based upon the value of such property which taxes are secured by a statutory Lien to secure the payment of such taxes, penalties and interest accruing thereon.

(b) "**Administrative Claim**" shall mean a Claim entitled to priority under sections 503[b] and 507[a][2] of the Bankruptcy Code in the Chapter 11 Cases of the Debtors.

(c) "**Allowed**" when used with respect to any Claim, except for a Claim that is an Administrative Claim, shall mean [1] such Claim to the extent it is not a Contested Claim; [2] such Claim to the extent it may be set forth pursuant to any stipulation or agreement that has been approved by Final Order; [3] a Contested Claim, proof of which was filed timely with the Bankruptcy Court and [A] as to which no objection was filed by the Objection Deadline; or [B] as to which an objection is filed by the Objection Deadline, to the extent determined by Final Order to be a valid obligation of the Debtor against which the Claim is asserted; if, as, and when determined by Final Order to be a valid obligation of the Debtor against which the Claim is asserted.

(d) "**Bankruptcy Code**" shall mean the Bankruptcy Reform Act of 1978, as amended, and codified at title 11 of the United States Code.

(e) "**Bankruptcy Court**" shall mean the Bankruptcy Court unit of the United States District Court for the Northern District of Texas, Dallas Division, or such other court having jurisdiction over the Chapter 11 Cases.

(f) "**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code.

(g) "**Bar Date**" shall mean July 5. 2016, the deadline for the filings of proofs of claim to assert all Claims, other than the claims of governmental authorities.

(h) "**Black Rock**" shall mean Black Rock Capital, Inc.

(i) "**Black Rock Available Cash**" shall mean an amount of Cash equal to $75,000 to be allocated to pay holders of Allowed Class 4BR Claims.

(j) "**Black Shale**" shall mean Black Shale Minerals, LLC.

(k) "**Business Day**" shall mean any day on which commercial banks are open for business in Dallas, Texas.

(l) "**Cash**" shall mean legal tender of the United States of America or short-term liquid investments that are readily convertible to known amounts of legal tender of the United States of America.

(m) "**Chapter 11 Cases**" shall mean the cases of the Debtors commenced under chapter 11 of the Bankruptcy Code on the Petition Date.

(n) "**Collateral**" shall mean any property of a Debtor subject to a valid, enforceable and non-avoidable Lien to secure the payment of a Claim.

(o) "**Confirmation Date**" shall mean the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

(p) "**Confirmation Hearing**" shall mean the date on which the Bankruptcy Court holds the hearing[s] on confirmation of the Plan.

(q) "**Confirmation Order**" shall mean the order of the Bankruptcy Court confirming the Plan.

(r) "**Contested**" when used with respect to a Claim, shall mean a Claim against a Debtor [1] that is listed in a Debtor's Schedules as disputed, contingent or unliquidated; [2] that is listed in a Debtor's Schedules as undisputed, liquidated and not contingent and as to which a proof of Claim has been filed with the Bankruptcy Court, to the extent the proof of Claim amount exceeds the scheduled amount; [3] that is not listed in a Debtor's Schedules, but as to which a proof of Claim has been filed with the Bankruptcy Court and to which an objection has been or is filed on or prior to the Objection Deadline and such objection has not been resolved by Final Order or stipulation or agreement approved by Final Order; and [4] any Unclassified Claim of which the Debtors have received written notice prior to the deadline for submitting same under Section 5.1 of the Plan or otherwise, and which has not been resolved by Final Order or stipulation or agreement approved by Final Order. Notwithstanding the foregoing, after the Objection Deadline, only Claims to which an Objection has been filed shall be deemed Contested Claims.

(s)    "**Contested Claims Reserve**" shall mean the reserve accounts established pursuant to this Plan for funding Contested Claims if and to the extent that such Claims are ultimately Allowed by Final Order and which are to be held pending resolution of Contested Claims by the entry of a Final Order allowing or disallowing such Contested Claim[s].

(t)    "**Contracts**" shall mean all executory contracts and unexpired leases as such terms are used within Bankruptcy Code section 365 to which a Debtor was a party as of the Petition Date.

(u)    "**Cross Border**" shall mean Cross Border Resources, Inc.

(v)    "**Cure Payment**" shall be the monetary payments required pursuant to Bankruptcy Code section 365[b][1][A] to cure defaults under Contracts to which a Debtor is a party and which will be assumed pursuant to the Plan. Such Cure Payment shall be conclusively determined and set for each such Contract at the Confirmation Hearing.

(w)    "**Debtors**" shall mean Red Mountain, RMR, Black Rock and Cross Border.

(x)    "**Disallowed**," when used with respect to a Claim, shall mean a Claim that has been disallowed by Final Order.

(y)    "**Effective Date**" shall mean a Business Day selected by the Debtors which is at least fifteen [15] days but not more than thirty [30] days after the Confirmation Date.

(z)    "**Equity Interest**" shall mean any (i) stock or membership interest or other instrument evidencing an ownership interest in a Debtor, (ii) right in a Debtor represented by an "equity security," as defined on section 101[16] of the Bankruptcy Code, or (iii) and any option, warrant or right, contractual or otherwise, to acquire an interest or security described in (i) or (ii), whether or not transferable, that existed immediately prior to the Effective Date, including but not limited to redemption, conversion, exchange, voting, participation, dividend rights, and liquidation preferences. Equity Interests shall include, where applicable, Preferred Equity Interests.

(aa)    "**Estimated Amount**" shall mean the maximum amount at which the Bankruptcy Court or, where required by applicable law, a United States District Court, estimates any Claim [or class of Claims] against a Debtor which is contingent, unliquidated or disputed, including, for the purpose of: [a] distribution under § 502[c], Bankruptcy Code; or [b] determining the feasibility of this Plan pursuant to § 1129[a][11], Bankruptcy Code for purposes of its confirmation.

(bb)    "**Estimation Order**" means an Order of the Bankruptcy Court or, where required by applicable law, the District Court, that determines the Estimated Amount of any Claim [or class of Claims], against a Debtor for any of the purposes as provided in this Plan.

(cc)    "**Federal Judgment Rate**" shall mean the rate referenced in 28 U.S.C. § 1961 in effect on the Petition Date, compounded annually.

(dd)    "**Fee Application**" shall mean an application of a Professional Person under section 330 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Chapter 11 Cases.

(ee)    "**Fee Claim**" shall mean a Claim of a Professional Person under section 330 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Chapter 11 Cases.

(ff)    "**Final Order**" shall mean [1] an order of a court having jurisdiction over the subject matter and person which has been entered and as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending or [2] in the event that an appeal, writ of

certiorari, reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure may be filed with respect to such order.

(gg) "**General Unsecured Claim**" shall mean any Claim against a Debtor that is not the claim of an Interest Burden Payee, a Priority Non-Tax Claim, a Secured Claim, a Class 5 Claim, or an Unclassified Claim.

(hh) "**Intercompany Claim**" shall mean any Claim by a Debtor held by another Debtor.

(ii) "**Interest Burden Payees**" shall mean the holder, pursuant to a written agreement, of a right to capture minerals in exchange for either a share of production or payments on account of a share of production; whether created before or after an oil and gas lease was entered into or which may exist in the absence of an oil and gas lease, including but not limited to overriding royalty interests, non-participating royalty interests, net profits interests, production payments, shut in royalties, working interests and unleased mineral interests.

(jj) "**Lienholder**" shall mean the holder of a Lien.

(kk) "**Mineral Owner**" shall mean a third party owner of mineral interests in oil, natural gas, and other minerals in place under a parcel of land that has entered into a written agreement with a Debtor to enter and capture oil, natural gas or other minerals through exploration, drilling, and production operations.

(ll) "**Objection Deadline**" shall mean the date by which objections to Claims shall be filed with the Bankruptcy Court and served upon the respective holders of each of the Claims as provided in Section 9.1 of the Plan.

(mm) "**Petition Date**" shall mean March 8, 2016.

(nn) "**Plan**" or "**Plan of Reorganization**" shall mean this Second Amended Joint Plan of Reorganization, either in its present form or as it may hereafter be altered, amended or modified from time to time.

(oo) "**Plan Funder**" shall mean Stone Street, Inc.

(pp) "**Priority Non-Tax Claim**" shall mean a Claim of the kind specified in section 507[a][3], [4], [5], [6], [7], [9] or [10] of the Bankruptcy Code.

(qq) "**Priority Tax Claim**" shall mean a Claim of a governmental unit of the kind specified in section 507[a][8] of the Bankruptcy Code, specifically including but not limited to claims for tax years ending on or before the Petition Date.

(rr) "**Preferred Equity Interests**" shall mean the 10.0% Series A Cumulative Redeemable Preferred Stock in Red Mountain designated by the Red Mountain Board of Directors on November 13, 2015.

(ss) "**Pro Rata**" shall mean

(i) if used in reference to a distribution of property to holders of Allowed Claims, a proportionate Distribution so that with respect to a particular Allowed Claim in such Class or group of Claims, the ratio of (a) (i) the amount of property distributed on account of such Claim to (ii) the amount of such Claim, is the

same as the ratio of (b) (i) the amount of property distributed on account of all Allowed Claims in such Class or group of Claims to (ii) the amount of all Allowed Claims in such Class or group of Claims; and

(ii)  if used in reference to holders of Equity Interests, a proportionate distribution so that with respect to a particular holder of an Equity Interest the ratio of (a)(i) the number of shares of Equity Interests held by a particular holder to (ii) the number of shares of New Red Mountain Equity distributed to such holder pursuant to the Plan, is the same as the ratio of (b)(i) the total number of shares of Equity Interests held by all holders in the same Class to (ii) the total number of shares of New Red Mountain Equity distributed to such Class pursuant to the Plan.

(tt)  "**Professional Person**" shall mean a person retained or to be compensated pursuant to section 327, 328, 330, 503[b][2] or 1103 of the Bankruptcy Code.

(uu)  "**Red Mountain**" shall mean Red Mountain Resources, Inc.

(vv)  "**Red Mountain Available Cash**" shall mean an amount of Cash equal to $100,000.00 to be allocated to pay holders of Allowed Class 4RD Claims.

(ww)  "**RMR**" shall mean RMR Operating, LLC.

(xx)  "**Reorganized Debtors**" shall mean the Debtors, as reorganized, on and after the Effective Date.

(yy)  "**Schedules**" shall mean the Schedules of assets and liabilities and the statements of financial affairs filed by the Debtors as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such Schedules and statements have been or may be supplemented or amended.

(zz)  "**Secured Claim**" shall mean a Claim secured by a Lien on property of a Debtor, which Lien is valid, perfected and enforceable under applicable law, is not subject to avoidance under the Bankruptcy Code or other applicable non-bankruptcy law and which is duly established in the Chapter 11 Cases, but only to the extent of the value of the Collateral that secures payment of such Claim.

(aaa)  "**Stock Election**" means a vote indicated on the Ballot of the Holder of a Class 4RR Claim affirmatively opting to receive Common Stock in Cross Border in lieu of a Cash distribution on account if such holder's Class 4RR Claim and Class 6RR Claim, in accordance with Section 4.1[f] of the Plan.

(bbb)  "**Tax Liens**" shall mean any statutory Liens securing any Allowed Secured Claims of any Ad Valorem Taxing Authority. Tax Liens shall in all events include Liens which secure the payment of 2010 and prior years' ad valorem taxes.

(ccc)  "**Unclassified Claim**" shall mean any Priority Tax Claim or Administrative Claim.

(ddd)  "**Unsecured Claim**" shall mean a Claim other than a Secured Claim.

Unless a different definition is given in the Plan, all capitalized terms used in the Plan shall have the same meaning as ascribed in such terms in section 101 of the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

**1.2**  *Interpretation.*

Unless otherwise specified, all section, article and exhibit references in the Plan are to the respective section in, article of or exhibit to the Plan, as the same may be amended, waived or modified from time to time. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. All exhibits and schedules attached to the Plan are incorporated herein by such attachment.

### 1.3 *Reorganized Debtors.*

The Plan shall be liberally construed for the benefit of the Debtors and Reorganized Debtors regarding the interchangeableness of the term "*Debtors*" with the term "*Reorganized Debtors*" and other instances of the use "*Reorganized*."

**ARTICLE 2: CLASSIFICATION OF CLAIMS**

### 2.1 *Claims Classified.*

For purposes of organization and all confirmation matters, except as otherwise provided herein, all Claims [except for Administrative Claims and Priority Tax Claims] shall be classified as set forth in this Article 2 of the Plan.

### 2.2 *Administrative Claims and Priority Tax Claims.*

Administrative Claims and Priority Tax Claims against a Debtor shall not be classified for purposes receiving distributions under the Plan. Rather, all such Claims shall be treated separately as Unclassified Claims on the terms set forth in Article 5 of the Plan.

### 2.3 *Claims.*

With the exception of Unclassified Claims, the Plan classifies the Claims against the Debtors as follows:

| | | |
|---|---|---|
| [a] | Class 1RD: | Any Allowed Secured Claims of Ad Valorem Taxing Authorities against Red Mountain. |
| [b] | Class 1RR: | Any Allowed Secured Claims of Ad Valorem Taxing Authorities against RMR. |
| [c] | Class 1CB: | Any Allowed Secured Claims of Ad Valorem Taxing Authorities against Cross Border. |
| [d] | Class 1BR: | Any Allowed Secured Claims of Ad Valorem Taxing Authorities against Black Rock. |
| [e] | Class 2RD: | Any Allowed Claims of Interest Burden Payees against Red Mountain. |
| [f] | Class 2RR: | Any Allowed Claims of Interest Burden Payees against RMR. |
| [g] | Class 2CB: | Any Allowed Claims of Interest Burden Payees against Cross Border. |
| [h] | Class 2BR: | Any Allowed Claims of Interest Burden Payees against Black Rock. |
| [i] | Class 3RD[A]-[Z]: | Any Allowed Secured Claims not Otherwise Classified against Red Mountain. |
| [j] | Class 3RR[A]-[Z]: | Any Allowed Secured Claims not Otherwise Classified against RMR. |

| [k] | Class 3CB[A]-[Z]: | Any Allowed Secured Claims not Otherwise Classified against Cross Border. |
| [l] | Class 3BR[A]-[Z]: | Any Allowed Secured Claims not Otherwise Classified against Black Rock |
| [m] | Class 4RD: | All Allowed Priority Non-Tax Claims against Red Mountain. |
| [n] | Class 4RR: | All Allowed Priority Non-Tax Claims against RMR. |
| [o] | Class 4CB: | All Allowed Priority Non-Tax Claims against Cross Border. |
| [p] | Class 5: | All Claims of Black Shale. |
| [q] | Class 6RD: | Any Allowed General Unsecured Claims against Red Mountain. |
| [r] | Class 6RR: | Any Allowed General Unsecured Claims against RMR. |
| [s] | Class 6CB: | Any Allowed General Unsecured Claims against Cross Border. |
| [t] | Class 6BR: | Any Allowed General Unsecured Claims against Black Rock. |
| [u] | Class 7RR: | Allowed Equity Interests in RMR. |
| [v] | Class 7CB: | Allowed Equity Interests in Cross Border. |
| [w] | Class 7BR: | Allowed Equity Interests in Black Rock. |
| [x] | Class 7RD: | Allowed Equity Interests in Red Mountain. |
| [y] | Class 8: | Allowed Claims of Mineral Owners. |

## ARTICLE 3: IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS

### 3.1     *Impaired Classes of Claims and Equity Interests.*

The following classes of Claims and Equity Interests are impaired:  1CB, 1BR, 1RD, 1RR, 4RR, 4CB, 6CB, 6BR, 6RD, 6RR, and 7RD.  All other classes of Claims are unimpaired.

### 3.2     *Impairment Controversies.*

If a controversy arises as to whether any Claim or any class of Claims is impaired under the Plan, the Bankruptcy Court shall, upon notice and a hearing, determine such controversy.

## ARTICLE 4 : PROVISIONS FOR TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

### 4.1     *Treatment of Classified Claims.*

The classes of Claims against the Debtors shall be treated under the Plan as follows:

[a]     *Classes 1RD, 1RR, 1CB and 1BR – Any Allowed Secured Claims of Ad Valorem Taxing Authorities.* On the later of the Effective Date or the day upon which a Contested Class 1RD, 1RR, 1CB or 1BR Claim becomes Allowed, in full and final satisfaction of its Allowed Secured Claim, each holder of an Allowed Secured Claim in Class 1RD, 1RR, 1CB or 1BR shall receive a Cash payment equal to such Allowed Secured Claim without penalties accruing after the Petition Date.  For purposes of calculating the amount of a Class 1 Allowed Secured Claim, Claims in Class 1RD, 1RR, 1CB or 1BR shall bear interest from the Petition Date through the Effective Date at the rate provided under applicable non-bankruptcy law.  In the event of an objection to a Claim in this Class, any payments made to the holder of such Claim on account of such Claim while the objection is pending shall be

applied to the undisputed amount of the Claim. Any Ad Valorem Taxing Authority shall retain its Liens to secure its Allowed Class 1RD, 1RR, 1CB or 1BR Claim until the Allowed Secured Claim is paid.

[b] *Classes 2RD, 2RR, 2CB and 2BR – Any Allowed Claims of Interest Burden Payees.* On the later of the Effective Date or the day upon which a Contested Class 2RD, 2RR, 2CB or 2BR Claim becomes Allowed, in full and final satisfaction of its Allowed Class 2RD, 2RR, 2CB or 2BR Claim, each holder of an Allowed Secured Claim in Class 2RD, 2RR, 2CB or 2BR shall receive a Cash payment equal to such Allowed Class 2RD, 2RR, 2CB or 2BR Claim, with interest as provided under applicable non-bankruptcy law. Notwithstanding any contractual provision or applicable law that entitles the holder of an Allowed Class 2RD, 2RR, 2CB or 2BR Claim to demand or receive accelerated payment of such claim after the occurrence of a default, unless an objection to this Plan is received demanding cure of a specified default, entry of the Confirmation Order shall:

[i] be deemed to cure any default that occurred before or after the Petition Date, other than a default of a kind specified in Bankruptcy Code Section 365 [b][2];

[ii] reinstate the maturity of such Allowed Class 2RD, 2RR, 2CB or 2BR Claim as such maturity existed before such default;

[iii] finally determine that no compensation is due the holder of such Allowed Class 2RD, 2RR, 2CB or 2BR Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, including but not limited to any attorney's fees or costs associated with enforcement of such Interest Burden Payee's Allowed Class 2RD, 2RR, 2CB or 2BR Claim; and

[iv] otherwise leave unaltered the legal, equitable, or contractual rights of such holder of such Allowed Class 2RD, 2RR, 2CB or 2BR Claim.

[c] *Class 3RD[A] through 3RD[Z], 3RR[A] through 3RR[Z], 3CB[A] through 3CB[Z], and 3BR[A] through 3BR[Z] –Any Allowed Secured Claims not Otherwise Classified.* On the later of the Effective Date or the day upon which a Contested Class 3RD, 3RR, 3CB or 3BR Claim becomes Allowed, in full and final satisfaction of its Allowed Class 3RD, 3RR, 3CB or 3BR Claim, each holder of an Allowed Class 3RD, 3RR, 3CB or 3BR Claim against a Debtor, shall receive, at the applicable Reorganized Debtor's option, either [i] a Cash payment in the amount of such holder's Allowed Class 3RD, 3RR, 3CB or 3BR Claim; [ii] payment pursuant to the pre-Petition Date agreements between such holder and such applicable Debtor and retention of its Liens to secure the payment of the Allowed Class 3RD, 3RR, 3CB or 3BR Claim, or [iii] the surrender to such holder of all Collateral securing such Allowed Class 3RD, 3RR, 3CB or 3BR Claim in accordance with *In re Sandy Ridge Development Corp*, 881 F.2d 1346 [5th Cir. 1989], in which case such Allowed Class 3RD, 3RR, 3CB or 3BR Claim shall be deemed paid in full and fully satisfied and any deficiency thereon shall be treated as a Class 6 General Unsecured Claim against the Debtor which is liable for the Allowed Class 3 Claim. For purposes of the Plan, each Allowed Class 3RD, 3RR, 3CB or 3BR Claim shall be deemed separately classified into a subclass by Debtor [*e.g.*, 3RD[A], 3RD[B], 3RR[A], 3RR[B], 3CB[A], 3CB[B], 3BR[A], 3BR[B]] and the election made above made be made independently as to each such subclass. In the event that a Reorganized Debtor elects to provide the treatment referenced under [ii] of this paragraph, and notwithstanding any contractual provision or applicable law that entitles the holder of an Allowed Class 3RD, 3RR, 3CB or 3BR Claim to demand or receive accelerated payment of such claim after the occurrence of a default, unless an objection to this Plan is received demanding cure of a specified default, entry of the Confirmation Order shall:

[i] be deemed to cure any default that occurred before or after the Petition Date, other than a default of a kind specified in Bankruptcy Code Section 365 [b][2];

[ii] reinstate the maturity of such Allowed Class 3RD, 3RR, 3CB or 3BR Claim as such maturity existed before such default;

[iii] finally determine that no compensation is due the holder of such Allowed Class 3RD, 3RR, 3CB or 3BR Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law including but not limited to any attorney's fees or costs associated with enforcement of such holder's Allowed Class 3RD, 3RR, 3CB or 3BR Claim; and

[iv] otherwise leave unaltered the legal, equitable, or contractual rights of such holder of such Allowed Class 3RD, 3RR, 3CB or 3BR Claim.

[d]     Notwithstanding the foregoing, the Reorganized Debtors and any holder of an Allowed Secured Claim may agree to any alternate treatment of such Secured Claim, which treatment shall include preservation of such holder's Lien; provided, however, that such treatment shall not provide a return to such holder of an amount having a present value in excess of the amount of such holder's Allowed Secured Claim.  Each such agreement shall be presented to the Bankruptcy Court before or within 90 days after the Effective Date and shall not materially and adversely impact the treatment of any other creditor under the Plan.

[e]     *Class 4RD – Any Allowed Priority Non-Tax Claim Against Red Mountain.* On the later of the Effective Date or the day upon which a Contested Class 4RD Claim becomes Allowed, in full and final satisfaction of its Allowed Class 4RD Claim, each holder of an Allowed Claim in Class 4RD shall receive a Cash payment equal to such Allowed Class 4RD Claim.

[f]     *Class 4RR – Any Allowed Priority Non-Tax Claim Against RMR.* On the later of the Effective Date or the day upon which a Contested Class 4RR Claim becomes Allowed, in full and final satisfaction of its Allowed Class 4RR Claim, each holder of an Allowed Claim in Class 4RR shall receive at the option of the holder of the Allowed Class 4RR Claim either [i] a Cash payment equal to such Allowed Class 4RR Claim; or [ii] a Pro Rata Share of 5% of the Equity Interest in Cross Border calculated based upon the total Allowed amount of each holder of an Allowed Class 4CB Claim and Allowed Class 4RR Claim making the Stock Election. Any holder of an Allowed Class 4RR Claim making the Stock Election shall receive no distribution on such holder's Allowed Class 6RR Claim.

[g]     *Class 4CB – Any Allowed Priority Non-Tax Claim Against Cross Border.* On the later of the Effective Date or the day upon which a Contested Class 4CB Claim becomes Allowed, in full and final satisfaction of its Allowed Class 4CB Claim, each holder of an Allowed Claim in Class 4CB shall receive at the option of the holder of the Allowed Class 4CB Claim either [i] a Cash payment equal to such Allowed Class 4CB Claim; or [ii] a Pro Rata Share of 5% of the Equity Interest in Cross Border calculated based upon the total Allowed amount of each holder of an Allowed Class 4CB Claim and Allowed Class 4RR Claim making the Stock Election. Any holder of an Allowed Class 4CB Claim making the Stock Election shall receive no distribution on such holder's Allowed Class 6CB Claim.

[h]     *Classes 5– Any Allowed Claims of Black Shale.*  Black Shale shall retain all rights under its agreements with the Debtors.  Confirmation of the Plan shall

[i] be deemed to cure any default that occurred before or after the Petition Date, other than a default of a kind specified in Bankruptcy Code Section 365 [b][2];

[ii] reinstate the maturity of such Allowed Class 5 Claim as such maturity existed before such default;

[iii] finally determine that no compensation is due the holder of such Allowed Class 5 Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law including but not limited to any attorney's fees or costs associated with enforcement of such holder's Allowed Class 5 Claim; and
[iv] otherwise leave unaltered the legal, equitable, or contractual rights of such holder of such Allowed Class 5 Claim.

[i]     *Class 6RD — Any Allowed General Unsecured Claims against Red Mountain.* On the later of the Effective Date or the day upon which a Contested General Unsecured Claim in Class 6RD becomes Allowed, each holder of an Allowed General Unsecured Claim in Class 6RD shall receive, in full and final satisfaction of such Allowed Claim, a Cash payment equal to its Pro Rata Share of the Red Mountain Available Cash.

[j]     *Class 6RR — Any Allowed General Unsecured Claims against RMR.* Holders of Allowed Claims in Class 6RR shall receive no distribution on account of their Claims.

[k]     *Class 6CB — Any Allowed General Unsecured Claims against Cross Border.* On the later of the Effective Date or the day upon which a Contested General Unsecured Claim in Class 6CB becomes Allowed, each holder of an Allowed General Unsecured Claim in Class 6CB shall receive, in full and final satisfaction of such Allowed Claim, deferred quarterly Cash payments beginning one [1] year following the Effective Date and ending on the 11th anniversary of the Effective Date in an amount necessary to amortize such holder's Allowed Class 6CB Claim over a eleven [11] year period with interest at the Federal Judgment Rate.

[l]     *Class 6BR — Any Allowed General Unsecured Claims against Black Rock.* On the later of the Effective Date or the day upon which a Contested General Unsecured Claim in Class 6BR becomes Allowed, each holder of an Allowed General Unsecured Claim in Class 6BR shall receive, in full and final satisfaction of such Allowed Claim, a Cash payment in equal to its Pro Rata share of the Black Rock Available Cash.

[m]     *Class 8- Any Allowed Claims of Mineral Owners.* Mineral Owners shall retain all rights under their agreements with the Debtors. Confirmation of the Plan shall

[i] be deemed to cure any default that occurred before or after the Petition Date, other than a default of a kind specified in Bankruptcy Code Section 365 [b][2];
[ii] reinstate the maturity of such Allowed Class 8 Claim as such maturity existed before such default;
[iii] finally determine that no compensation is due the holder of such Allowed Class 8 Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law including but not limited to any attorney's fees or costs associated with enforcement of such holder's Allowed Class 8 Claim; and
[iv] otherwise leave unaltered the legal, equitable, or contractual rights of such holder of such Allowed Class 8 Claim.

### 4.2     *Treatment of Equity in the Debtors.*

[a]     *Class 7RD — Equity Interests in Red Mountain.* The existing Equity Interests in Red Mountain will be extinguished. Accordingly, holders of Class 7RD Equity Interests will not retain their

Equity Interests in Red Mountain. Red Mountain will be dissolved under applicable non-bankruptcy law.

[b] *Class 7RR – Equity Interests in RMR.* All Equity Interests in RMR held by Red Mountain will be transferred to Cross Border.

[c] *Class 7CB – Equity Interests in Cross Border.* 5% of the Equity Interests in Cross Border held by Red Mountain will be transferred to holders of Allowed Class 4RR Claims and Allowed Class 4CB Claims making the Stock Election. The remaining 78% of the Equity Interests in Cross Border held by Red Mountain will be transferred to the Plan Funder. Any other Holders of Equity Interests in Class 7CB will retain their Equity Interests in Cross Border.

[d] *Class 7BR – Equity Interests in Black Rock.* All Equity Interests in Black Rock held by Red Mountain will be transferred to Cross Border.

## ARTICLE 5 : PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN

### 5.1 *Treatment of Administrative Claims.*

The holder of an Administrative Claim [including Fee Claims] incurred before the Effective Date shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, an application for the allowance of such Administrative Claim and, if applicable, a Fee Application within forty-five [45] days after the Confirmation Date. Failure to file and serve these documents timely and properly shall result in the Administrative Claim being forever barred and discharged; provided, however, that the Reorganized Debtors may, but are not obligated to, pay any Administrative Claim representing a liability incurred in the ordinary course of business of the Debtors or that is held by an Ad Valorem Taxing Authority even in the absence of the timely filing of such documents. Each holder of an Administrative Claim against a Debtor which is ordered to be paid pursuant to a Final Order shall receive upon the date on which such orders becomes a Final Order [1] the amount of such holder's Allowed Administrative Claim in one Cash payment or [2] such other treatment as may be agreed upon in writing by the Reorganized Debtors and such holder. Administrative Claims. Ad Valorem Taxing Authorities are not required to file an Administrative Expense claim or a request for payment in order for such Allowed Administrative Expense Claim to be entitled to payment.

### 5.2 *Treatment of Priority Tax Claims.*

Each holder of an Allowed Priority Tax Claim shall receive in full satisfaction of such holder's Allowed Priority Tax Claim a Cash payment in the amount of the Allowed Priority Tax Claim on or before the later of [i] the Effective Date, or [ii] ten [10] Business Days after the Priority Tax Claim is Allowed.

### 5.3 *Treatment of Intercompany Claims.*

No other distributions will be made on account of Intercompany Claims.

## ARTICLE 6 : ACCEPTANCE OR REJECTION OF THE PLAN

**6.1** *Classes Entitled to Vote.*

Classes 1CB, 1BR, 1RD, 1RR, 4RR, 4CB, 6CB, 6BR, and 6RD are entitled to vote.

**6.2** *Cramdown.*

Should the Bankruptcy Court determine that one or more Classes of Claims is entitled to vote on the Plan, then if any such Class of Claims shall fail to accept the Plan in accordance with section 1126[c] of the Bankruptcy Code, the Debtors request confirmation of the Plan in accordance with section 1129[b] of the Bankruptcy Code.

## ARTICLE 7 : MEANS FOR IMPLEMENTATION OF THE PLAN

**7.1** *Funding of Plan Distributions*

The Plan Funder will contribute $100,000 to the Plan. Red Mountain, RMR, Cross Border and Black Rock will each will retain sufficient assets to make the payments called for by the Plan.

**7.2** *Vesting of Assets and Retention of Causes of Action.*

On the Effective Date, all real and personal property of the estate of each of the Debtors, including but not limited to all causes of action of each Debtor and its estate (except for Cash in the amount needed to make the distributions called for by each Debtor under the Plan) shall vest in the Applicable Reorganized Debtor except for the assets of Red Mountain which shall vest in Cross Border. Such vesting shall be subject to any Liens of holders of Allowed Secured Claims; provided that upon any subsequent conversion to a case under chapter 7, all assets vesting in a Reorganized Debtor, shall pass to the chapter 7 trustee as property of the chapter 7 estate subject to those Claims, Liens, and encumbrances as Allowed and restructured in this Plan and as specified herein.

Any and all claims, causes of action and enforceable rights of a Debtor against third parties, or assertable by the Debtors on behalf of their Creditors, their estates or themselves, whether brought in the Bankruptcy Court or any other forum, shall be retained by the applicable Reorganized Debtor pursuant to Bankruptcy Code Section 1123[b][3][B] (again, except for those of Red Mountain which shall vest in Cross Border). Without limiting the foregoing, the Reorganized Debtors are specifically retaining claims against:

> (1) third-parties (including but not limited to vendors to the Debtors) for obligations, transfers of property or interests in property, offsets, debt forgiveness, rebates, Cash, and other types or kinds of property or interests in property (or the value thereof), recoverable or avoidable pursuant to §§ 544, 545, 547, 548, 549, 550 and 553, Bankruptcy Code or any applicable law;

(2) third-parties for damages, general or exemplary (or both) or other relief, relating to or based upon (A) indebtedness owing to Debtors, (B) fraud, negligence, gross negligence, willful misconduct, or any other tort actions, (C) breaches of contract, (D) violations of federal or state securities laws, (E) violations of applicable corporate laws, (F) breaches of fiduciary or agency duties, (G) causes of action based on disregard of the corporate form or piercing the corporate veil or other liability theories;

(3) rights existing under applicable agreements between the Debtors and Black Shale;

(4) third-parties for damages or other relief based upon any other claim of Debtors to the extent not specifically compromised or released by Order of the Bankruptcy Court or pursuant to this Plan or an agreement referred to, or incorporated into, this Plan.

### 7.3    *Assumption of Liabilities.*

The liability for and obligations under the Plan shall be assumed by and become obligations of the Reorganized Debtors.

### 7.4    *Estimated Claims.*

Except as otherwise provided herein, the Court may estimate for purposes of allowance pursuant to § 502[c], Bankruptcy Code, [i] any Contested Claim or unliquidated Claim, or [ii] any portion or part of an Claim that is, itself, unliquidated.  Any Estimation Order, to the extent it becomes a Final Order, shall determine the amount of the Allowed Claim so estimated.

### 7.5    *Claims on File; No Allowance of Untimely Claims.*

The Debtors are relying on the formal proofs of Claims on file and the Debtors' Schedules currently on file in seeking confirmation of the Plan.   No informal proof of claim shall be deemed to have been filed in these Chapter 11 Cases.

### 7.6    *Officers and Directors.*

The managers, officers and directors of the Reorganized Debtors shall be those managers, officers and directors as of the Effective Date until other managers, officers or directors are designated pursuant to applicable non-bankruptcy law.

### 7.7    *Transfer of Cross Border Equity Interests.*

Pursuant to section 1145(a) of the Bankruptcy Code, the transfer of the Cross Border Equity Interests to the Plan Funder shall be exempt from the registration requirements of section 5 of the Securities Act and other applicable law under section 4(a)(2) of the Securities Act or another available exemption from registration under the Securities Act. The issuance and distribution of the such Equity Interests shall be exempt from the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration of an offer or sale of securities under section 1145(a) of the Bankruptcy Code.

## ARTICLE 8 : PROVISIONS GOVERNING DISTRIBUTIONS

### 8.1 *Distributions.*

Except as otherwise provided in this Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date, as funds are available, or as the Bankruptcy Court may order.

### 8.2 *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the proofs of Claim filed by such holders [or at the last known address of such a holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address]. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Debtors are notified in writing of such holder's then current address, at which time all missed distributions shall be made to such holder without interest. After the first anniversary of the Effective Date, all unclaimed property shall revert to the Reorganized Debtors or any successor thereto, and the Claim of any holder with respect to such property shall be discharged and forever barred.

### 8.3 *Time Bar to Cash Payments.*

Checks issued by Reorganized Debtors in respect of Allowed Claims shall be null and void if not negotiated within six months after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Reorganized Debtors by the holder of the Allowed Claim with respect to which such check originally was issued. Any Claim in respect of such a voided check shall be made on or before the later of [1] the first anniversary of the Effective Date or [2] 90 days after the date of reissuance of such check. After such date, all Claims in respect of void checks shall be discharged and forever barred.

### 8.4 *Withholding of Taxes.*

The Reorganized Debtors shall withhold from any assets and property distributed under this Plan any assets and or property which must be withheld for federal, state and local taxes payable by the Entity entitled to such property to the extent required by applicable law.

## ARTICLE 9 : PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS UNDER THE PLAN

### 9.1 *Objection Deadline.*

As soon as practicable, but in no event later than ninety [90] days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made. Notwithstanding the foregoing sentence, as to any Claim which is filed after the Effective Date, an objection to such Claim shall be filed on or before ninety [90] days after the date on which such Claim is filed.

### 9.2 *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to the disputed portion of any Claim to the extent it is a Contested Claim unless and until such Contested Claim becomes an Allowed Claim. Payments and distributions to each holder of a Contested Claim, to the extent that such Claim ultimately becomes an Allowed Claim, shall be made in accordance with the provisions of the Plan governing the class of Claims to which the respective holder belongs.

### 9.3 *Contested Claims.*

[a] Establishment of Contested Claims Reserve. Notwithstanding any other provision of this Plan, no assets or property shall be distributed under this Plan on account of any Contested Claim. For all Contested Claims, the Reorganized Debtors shall establish and hold, in trust, distributions to be made on account of any Claim [each such reserve being called a "Contested Claims Reserve"] which is a Contested Claim, and shall place in each Contested Claims Reserve the assets and property to be distributed on account of such Contested Claims pursuant to this Plan, pending Allowance or Disallowance of such Claim. Pending entry of a Final Order concerning a Contested Claim, the Reorganized Debtors shall pay into the Contested Claims Reserve all payments provided for under this Plan which would have been required to be delivered to the holder of the Contested Claim as if the Contested Claim were an Allowed Claim. Cash held in any Contested Claims Reserve shall be held in a segregated interest-bearing trust account. To the extent practicable, the Reorganized Debtors may invest the Cash in any Contested Claims Reserve in a manner that will yield a reasonable net return, taking into account the safety of the investment. Each Contested Claims Reserve shall be held in a federally-insured financial institution. No funds shall be released from a Contested Claims Reserve absent an order from the Bankruptcy Court.

[b] Determination of Contested Claims Reserve. The Debtors shall establish and fund a Contested Claims Reserve in respect of each Contested Claim in an amount asserted by the holder of a Contested Claim in a filed proof of claim, or if no proof of claim is filed, the amount, if any, set forth in the Debtor's Schedules. Notwithstanding the foregoing, with respect to any Contested Claim, the Debtors may seek to establish a different amount of the Contested Claims Reserve applicable to such Contested Claim after notice and opportunity for a hearing to the holder of the Contested Claim. The Bankruptcy Court may, at any time, including upon request of a party in interest, determine for each Contested Claim, the amount of assets and property sufficient to fund each Contested Claims Reserve established with respect to any such Claim. Any unsecured claimant holding a Contested Claim so estimated will have recourse only to undistributed assets and property in the Contested Claims Reserve to satisfy the Contested Claim and not to the Reorganized Debtors or any other assets or property, should the Allowed Claim of such claimant, as finally determined by a Final Order, exceed such Estimated Amount.

[c] Return of Assets. Except as otherwise provided herein, all assets and properties [and all interest payments and dividends previously paid in connection therewith] in any Contested Claims Reserve remaining after the resolution of all disputes relating thereto shall be returned to the Reorganized Debtors.

### ARTICLE 10:
### PROVISIONS GOVERNING EXECUTORY CONTRACTS AND

## UNEXPIRED LEASES UNDER THE PLAN

### 10.1    Assumption or Rejection of Contracts.

The Plan constitutes a motion to assume, as of the Effective Date, all Contracts. Except as set forth in such motions or Orders of the Bankruptcy Court, as to assumed Contracts, [a] no cure of such Contracts pursuant to Bankruptcy Code section 365[b][1][A] is necessary other than the Cure Payments; [b] no Bankruptcy Code section 365[b][1][B] compensation is owing or shall be owing upon the assumption of such Contracts; [c] confirmation of this Plan shall be deemed [i] adequate assurance of prompt cure of any default under such Contracts solely based upon a Debtor's obligation in the Plan to make the Cure Payments, [ii] adequate assurance of future performance under such Contracts, and [iii] consent by the party to such Contract to the assignment or sublease of the property subject to the Contract to any third party disclosed at the Confirmation Hearing.

### 10.2    Bar to Rejection Damages.

If the rejection of a Contract by a Debtor results in damages to the other party or parties to such Contract, a Claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against such Debtor, the Reorganized Debtors or their respective property or their agents, successors or assigns, unless a proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors on or before sixty [60] days following the Effective Date.

### 10.3    Insurance Policies.

Notwithstanding anything in the Plan, all insurance policies under which a Debtor is the insured party shall be deemed assumed as of the Confirmation Date.  All payments upon such policies are current; no cure payments are necessary.

### 10.4    Effect on Royalty Interests and Oil & Gas Leases

Nothing in the Plan shall affect, modify, or impair the rights of any holder of a royalty interest in the production of the assets of a Debtor, which is otherwise valid, perfected, unavoidable and enforceable in accordance with applicable law to receive royalty or other payments which become due on and after the Effective Date.

On the Effective Date, each Debtor's right, title and interest in and to all of such Debtor's oil & gas leases, shall revest in such Debtor as reorganized hereby on the terms and conditions set forth in the Plan.  To the extent such oil & gas leases may be deemed to be, and treated as though they are, executory contracts, such leases shall be deemed assumed pursuant to the Plan and section 365 of the Bankruptcy Code consistent with Section 10.1 of the Plan.

## ARTICLE 11 : RETENTION OF JURISDICTION

### 11.1    Scope of Jurisdiction.

Pursuant to sections 1334 and 157 of title 28 of the United States Code, until the time that an order is entered closing the Chapter 11 Cases, the Bankruptcy Court shall, to the extent legally permitted, retain and have jurisdiction over all matters arising in, arising under and related to the

Chapter 11 Cases and the Plan. The Bankruptcy Court shall retain jurisdiction to the fullest extent allowed by applicable law, including but not limited to the following specific purposes:

[a] to modify this Plan pursuant to the Bankruptcy Rules and the Bankruptcy Code;

[b] to enforce and interpret the terms and conditions of this Plan;

[c] to enter such orders, including injunctions, as are necessary to enforce the title, rights, and powers of the Reorganized Debtors;

[d] to enter an order concluding and terminating the Chapter 11 Cases;

[e] to correct any defect, cure any omission, or reconcile any inconsistency in this Plan, or the Confirmation Order as may be necessary, consistent with the requirements of the Bankruptcy Code and Bankruptcy Rules to carry out the purposes and intent of this Plan, including the adjustment of the date[s] of performance under this Plan in the event the Effective Date does not occur as provided herein, so that the intended effect of this Plan may be substantially realized thereby;

[f] to allow or disallow all Unclassified Claims, including Fee Claims;

[g] to hear and determine any causes of action arising prior to the Effective Date or thereafter or in any way related to this Plan or the transactions contemplated hereby;

[h] to determine any and all applications pending on Confirmation for the rejection, assumption or assignment of Contracts and the allowance of any Claim resulting therefrom;

[i] to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

[j] to hear and determine any and all adversary proceedings, applications, and contested matters, including any remands of appeals;

[k] to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

[l] to hear and determine any timely objections to or applications concerning Claims or the allowance, disallowance, classification, priority, compromise, estimation, or payment of any Claim, or Equity Interest;

[m] to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

[n] to enter and implement such orders as may be necessary or appropriate to execute, interpret, implement, consummate, or enforce the Plan and the transactions contemplated thereunder;

[o] to hear and determine matters concerning state, local, and federal taxes in accordance with §§ 346, 505, and 1146, Bankruptcy Code;

[p] to adjudicate claims retained by the Reorganized Debtors in accordance with the Plan, subject to referral to the District Court, if necessary;

[q] to enter Estimation Orders;

[r] to determine claims under 11 U.S.C. § 506[c] against the holders of any Allowed Secured Claim; and

[s] to enter orders implementing, or declaring the rights of the parties to, the Sale.

## 11.2 *Failure of the Bankruptcy Court to Exercise Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under or related to this Case, including the matters set forth in Section 11.1 of the Plan, this Article 11 shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE 12 : MISCELLANEOUS PROVISIONS

### 12.1 *Setoff Rights.*

In the event that a Debtor has a claim of any nature whatsoever, including but not limited to a 11 U.S.C. 506[c] claim, against the holder of a Claim, then the Reorganized Debtor may, but is not required to, setoff against the Claim [and any payments or other distributions to be made in respect of such Claim hereunder], subject to the provisions of section 553 of the Bankruptcy Code. Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by such Debtor/Reorganized Debtor of any claim that such Debtor/Reorganized Debtor may have against the holder of a Claim.

### 12.2 *Discharge.*

Entry of the Confirmation Order shall discharge all existing debts and Claims of any kind, nature or description whatsoever against the Debtors or any of its assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code, including but not limited to Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date and all debts of the kind specified in sections 502[g], 502[h] or 502[i] of the Bankruptcy Code, whether or not [a] a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; [b] a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or [c] the holder of a Claim has accepted the Plan. As provided in section 524 of the Bankruptcy Code, the discharge shall void any judgment against the Debtors or Reorganized Debtors at any time obtained to the extent it relates to a Claim discharged and operates as an injunction against the prosecution of any action against the Debtors, the Reorganized Debtors, or any of their property, to the extent it relates to a Claim discharged. Notwithstanding anything to the contrary, this Section 12.2 does not enjoin creditors from enforcing their rights under the Plan and does not apply to post-petition ad valorem taxes.

### 12.3 *Injunctions.*

**EXCEPT AS PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, ALL ENTITIES THAT HAVE HELD, CURRENTLY HOLD OR MAY HOLD A CLAIM OR OTHER DEBT OR LIABILITY THAT IS DISCHARGED PURSUANT TO THE TERMS OF THE PLAN SHALL BE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF ANY SUCH DISCHARGED CLAIM, DEBT OR LIABILITY:**

**(I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING AGAINST ANY DEBTOR OR REORGANIZED DEBTOR, OR ANY OF ITS PROPERTY, OTHER THAN TO ENFORCE ANY RIGHT TO A DISTRIBUTION PURSUANT TO THE PLAN;**

**(II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST ANY DEBTOR OR REORGANIZED DEBTOR, OR ANY OF ITS PROPERTY, OTHER THAN AS PERMITTED PURSUANT TO (I) ABOVE;**

**(III) CREATING, PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE AGAINST ANY DEBTOR OR REORGANIZED DEBTOR, OR ANY OF ITS PROPERTY;**

**(IV) ASSERTING A SETOFF, RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO ANY DEBTOR OR REORGANIZED DEBTOR; AND**

**(V) COMMENCING OR CONTINUING ANY ACTION, IN ANY MANNER, IN ANY PLACE THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN.**

**12.4**  *Pre-Petition Date Lawsuits and Insurance.*

On the Effective Date, all pre-Petition Date lawsuits, litigations, administrative actions or other proceedings, judicial or administrative, in connection with the assertion of a Claim shall be dismissed as to the Reorganized Debtors; provided however, if the appeal of any such matter is pending as of the Confirmation Date, the Claim shall be determined by the appellate court[s] in which such case is pending; provided further that if such case is reversed or remanded to the trial court, the Claim shall be asserted in the Chapter 11 Cases and finally determined by the Bankruptcy Court.

Dismissals of proceedings provided herein shall be with prejudice to the assertion of such Claim in any manner other than as prescribed by the Plan.  **ALL PARTIES TO ANY SUCH ACTION SHALL BE ENJOINED BY THE BANKRUPTCY COURT IN THE CONFIRMATION ORDER FROM TAKING ANY ACTION TO IMPEDE THE IMMEDIATE AND UNCONDITIONAL DISMISSAL OF SUCH ACTIONS.**  Confirmation and consumation of the Plan shall have no effect on insurance policies of either of the Debtors in which either of the Debtors is or was the insured party; and the Reorganized Debtors shall become the insured party under any such policies.  Each insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to the Debtors' bankruptcy, the Plan or any provision within the Plan, including the treatment or means of liquidation set out within the Plan.

**12.5**  *De Minimis Distributions.*

No distribution of less than $25.00 shall be made to any holder of an Allowed Claim.  Such undistributed amount will be retained by the Reorganized Debtors.

**12.6**  *Payment of Statutory Fees.*

The Reorganized Debtors shall be responsible for the timely payment of fees incurred pursuant to 28 U.S.C. § 1930[a][6] until the clerk of the Bankruptcy Court closes the Chapter 11 Cases.  The Reorganized Debtors shall file with the Court and serve upon the U.S. Trustee a quarterly financial report for each quarter [or portion thereof] that the case remains open in a format prescribed by the U.S. Trustee.

**12.7**  *Post-Effective Date Fees and Expenses of Professional Persons.*

Except as provided in this Plan, after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay

the reasonable fees and expenses of the Professional Persons employed by the Reorganized Debtors, related to the implementation and consummation of the Plan, provided, however, that no such fees and expenses shall be paid except upon receipt by a Reorganized Debtor of a written invoice, which invoice shall also be served upon counsel for the Reorganized Debtors, and the United States Trustee, by the Professional Person seeking fees and expense reimbursement and provided, further, however, that a Reorganized Debtor may, within 10 days after receipt of an invoice for fees and expenses, request the Bankruptcy Court to determine any such request and the Bankruptcy Court shall have jurisdiction to do so. In such event, the Bankruptcy Court shall apply the same standard for approval of fees and expenses as applied throughout these Chapter 11 Cases.

### 12.8    *Bankruptcy Restrictions.*

From and after the Effective Date, the Reorganized Debtors shall no longer be subject to the restrictions and controls provided by the Bankruptcy Code [*e.g.*, section 363 or 364]. The Reorganized Debtors may conduct their affairs in such manner as is consistent with corporations not in bankruptcy without the need of seeking Bankruptcy Court approval. No monthly operating reports will be filed after the Effective Date; however, the Reorganized Debtors shall provide the U.S. Trustee such financial reports as the U.S. Trustee may reasonably request until the entry of a final decree.

### 12.9    *Release of Liens Upon Payment.*

Upon the payment in full of any Allowed Secured Claim as provided under this Plan, with the exception of Allowed Claims of Ad Valorem Taxing Authorities, the holder of such Allowed Secured Claim shall execute, deliver and file a release of all liens and security interests securing its Allowed Secured Claim within twenty-one [21] days of such payment.

### 12.10    *Binding Effect.*

The Plan shall be binding upon and inure to the benefit of the Reorganized Debtors, the holders of Claims, the holders of Equity Interests, and their respective successors and assigns; provided, however, that if the Plan is not confirmed, the Plan shall be deemed null and void and nothing contained herein shall be deemed [i] to constitute a waiver or release of any Claims by the Debtors, or any other Person, [ii] to prejudice in any manner the rights of the Debtors, or any other Person, or [iii] to constitute any admission by the Debtors, or any other Person.

### 12.11    *Governing Law.*

Unless a rule of law or procedure is supplied by federal law [including the Bankruptcy Code and Bankruptcy Rules], the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with the Plan or the Chapter 11 Cases, except as may otherwise be provided in such agreements, documents and instruments.

### 12.12    *Modification of Plan.*

Modifications of the Plan may be proposed in writing by the Debtors at any time before the Confirmation Date, provided that [a] the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and [b] the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Plan may be modified at any time after the Confirmation Date and before substantial consummation by the Debtors/Reorganized Debtors, provided that [i] the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, [ii] the

Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code and [iii] the circumstances warrant such modifications. A holder of a Claim that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

### 12.13 *Creditor Defaults.*

Any act or omission by a creditor in contravention of a provision within this Plan shall be deemed an event of default under this Plan. In the event a Reorganized Debtor asserts that a holder of a Claim is in default under the Plan, such Reorganized Debtor must provide such holder of a Claim with written notice ["Notice to Creditor"] of such default via overnight mail or similar same-day or express delivery to the address of such holder as set forth on the proof[s] of Claim filed by such holder [or at the last known address of such a holder if no proof of Claim is filed or if such Reorganized Debtor has been notified in writing of a change of address]. If the default asserted in the Notice to Creditor remains uncured on the fifteenth [15th] day from the date on which such Notice to Creditor is sent, the Reorganized Debtor may pursue any rights or remedies it may have under applicable bankruptcy or non-bankruptcy law, whether state, federal or otherwise, including seeking to hold the defaulting party in contempt of the Confirmation Order. If such creditor is found to be in default under the Plan, then in addition all other remedies available to the Reorganized Debtors, such party may be ordered to pay the reasonable attorneys' fees and costs of the Reorganized Debtor in pursuing such matter, at the Bankruptcy Court's discretion. Furthermore, upon the finding of such a default by a creditor, the Bankruptcy Court may [a] designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Federal Rule of Civil Procedure 70 or [b] make such other order as may be equitable which does not materially alter the terms of the Plan as confirmed.

### 12.14 *Debtors' Default.*

Except as otherwise provided in this Plan, in the event that the holder of an Allowed Claim asserts that a default under the Plan has occurred, such creditor must provide the Reorganized Debtors with written notice ["Notice"] of such default to the following addresses: c/o Howard Marc Spector, 12770 Coit Road, Suite 1100, Dallas, TX 75251 and c/o Alan Barksdale, 14282 Gillis Rd., Farmers Branch, TX 75244, via certified mail, overnight mail or similar same-day or express receipted delivery. If the default asserted in the Notice remains uncured on the fifteenth [15th] day from the date on which such Notice is sent, the holder of such Allowed Claim may pursue any rights or remedies it may have under applicable non-bankruptcy law, whether state, federal or otherwise.

### 12.15 *Severability.*

SHOULD THE BANKRUPTCY COURT DETERMINE THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR TRANSACTION, THE DEBTORS MAY MODIFY THE PLAN IN ACCORDANCE WITH SECTION 12.12 OF THE PLAN SO THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY CLAIM. SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT [1] LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR [2] REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.

### 12.16 *Substantial Consummation/Closing the Case.*

Upon initiating payments or distributions on Allowed Claims required to be paid pursuant to Articles 4 and 5, the Plan shall be deemed substantially consummated. Upon motion by the Reorganized Debtors, the Chapter 11 Cases shall be closed and the Bankruptcy Court shall issue a final decree containing such provisions as may be equitable.

### 12.17   *Integration Clause.*

This Plan is a complete, whole, and integrated statement of the binding agreement between the Debtors, creditors, and the parties-in-interest upon the matters herein.

### 12.18   *Exculpations.*

The Debtors, the Reorganized Debtors, and their respective directors, officers, employees, predecessors, successors, attorneys, accountants, financial advisors, appraisers, representatives and agents, acting in such capacity, shall neither have nor incur any liability to any Entity for any act taken or omitted to be taken in connection with, related to or arising out of the Reorganization Cases or the consideration, formulation, preparation, dissemination, confirmation, effectuation, implementation or consummation of the Plan or any transaction proposed in connection with the Debtors, the Chapter 11 Cases or any contract, instrument, release or other agreement or document entered into or delivered, or any other act taken or omitted to be taken, in connection therewith; provided, however that the foregoing provisions of this Section shall have no effect on:  (a) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (b) the liability of any Entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

### 12.19   *Compromise and Settlement.*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise of all Claims and controversies relating to the contractual, legal and subordination rights that a holder of an Allowed Claim or Interest may have against any Debtor, or any distribution to be made on account of such an Allowed Claim. Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the benefits provided under the Plan and as a mechanism to effect a fair distribution of value to the Debtors' constituencies, except as set forth in the Plan, the provisions of the Plan shall also constitute a good-faith compromise of all Claims and controversies by any Debtor against any other Debtor (including but not limited to Intercompany Claims). In each case, the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their estates and the holders of such Claims and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice or action, order or approval of the Bankruptcy Court, the Debtors may compromise and settle Claims against other Entities and after the Effective Date, such right shall pass to the Reorganized Debtors.

DATED:      June 22, 2018.

Respectfully submitted,

By: _/s/ Howard Marc Spector_
Howard Marc Spector
TBA #00785023

SPECTOR & JOHNSON, PLLC
Banner Place, Suite 1100
12770 Coit Road
Dallas, Texas 75251
(214) 365-5377
FAX: (214) 237-3380
EMAIL: hspector@spectorjohnson.com

COUNSEL FOR THE DEBTORS